MID-STATE PRODUCTS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 24793. Promulgated February 15, 1954.

*Fred H. Kelly, Esq.*, for the petitioner.
*Elmer E. Lyon, Esq.*, for the respondent.

698

702

710

OPINION.

TURNER, *Judge:*

"*Deferred Development and Pre-Operating Expense.*"

Our first question is as to the deductibility of $15,239.39 expended by the petitioner during its fiscal year ended November 30, 1941, and capitalized on its books under the heading "Construction Account" and then in an account styled "Deferred Development and Pre-Operating Expense," from which, during the fiscal years 1942 and 1943, it was charged as cost or expense in producing the first 6,000,000 pounds of dried eggs sold to the Surplus Marketing Administration. The expenditures in question were generally in the nature of salaries and compensation for services, traveling expenses, telephone, tele-

graph, office supplies, automobile expense, and the like. As an alternative claim, the petitioner contends that if it was in error in capitalizing the amounts in question and writing them off in the fiscal years 1942 and 1943 against the first 6,000,000 pounds of powdered eggs produced, then the amounts were deductible as ordinary and necessary expenses in the fiscal year 1941, the year in which they were actually paid or incurred.

In our disposition of the case, we do not reach the petitioner's alternative claim. The respondent agrees with petitioner that the expenditures made in 1941, in setting up the powdered egg business, were capital items, and even though they are of a type which ordinarily is deductible currently as ordinary and necessary expenses, we are of the view that the facts of record justify the respondent's concurrence. In *Goodell-Pratt Co.*, 3 B. T. A. 30, where the question was whether certain expenditures should be regarded as capital expenditures, we quoted with approval from Applied Theory of Accounts, page 226, by Paul J. Esquerre, as follows:

When subjected to a theoretical analysis, this term appears to apply to such expenses as, in the aggregate, represent the cost of the increased earning capacity of the enterprise as a whole or of particular parts thereof, which has been secured over the earning capacity known to exist before the said expenses were incurred.

Here the expenditures were designed and intended to increase the earning capacity of petitioner beyond that of the shell egg business, for which it was organized and in which it was engaged, by setting up and establishing a new and additional business, namely, that of producing and selling dried eggs in which operations actually began in the next succeeding year.

In the absence of recovery through a sale or exchange of a capital item, capital costs, if recoverable tax-wise, are recovered through depreciation, obsolescence, amortization, or loss deductions. Not all capital items are wasting assets, however, and it does not follow that depreciation or amortization deductions with respect thereto begin or are allowable upon their acquisition and utilization in the taxpayer's business. *X-Pando Corporation*, 7 T. C. 48; *Mills Estate, Inc.*, 17 T. C. 910; *Duesenberg, Inc. of Delaware*, 31 B. T. A. 922. See and compare *A. Finkenberg's Sons, Inc.*, 17 T. C. 973; *Ralphs-Pugh Co.*, 7 T. C. 325; and *Charley J. Bradley*, 41 B. T. A. 152.

In support of its action in charging the expenditures against the first 6,000,000 pounds of dried eggs produced and sold, the petitioner cites and relies on *United Profit-Sharing Corporation* v. *United States*, 66 Ct. Cl. 171. Whatever may be said of the ruling in that case, it is not authority for the petitioner's claim here. There the Court of Claims found the facts to be that the expenditures in an advertising

campaign represented the costs of certain designated contracts and that those costs were to be allocated to the various contracts according to the volume and lives thereof. Here, even though it be said that the items in question were expended in procuring dried egg contracts with the Surplus Marketing Administration, no factual basis is shown for choosing the first contracts up to 6,000,000 pounds and excluding all later contracts. The Surplus Marketing Administration did state in its letter of September 15, 1941, that it would purchase dried eggs from petitioner, if it should construct its facilities, but the amount specifically mentioned was 3,000,000 pounds, not 6,000,000, and there was no unqualified commitment as to any amount, but only that it would purchase dried eggs from petitioner up to 3,000,000 pounds at "reasonable price levels in accordance with our [Surplus Marketing Administration's] normal offer and acceptance procedure and provided that prices at which you [petitioner] offer eggs are competitive with other offers we [Surplus Marketing Administration] receive." Furthermore, the commitment, if it may be called a commitment, did not extend beyond June 30, 1942, after which petitioner was to "receive equitable consideration with all other firms producing dried eggs." Just why petitioner decided to charge the items in question against the first 6,000,000 pounds of dried eggs sold to the Surplus Marketing Administration, is not clear, since at the time the decision was made on December 15, 1941, the total orders from that agency amounted to only 400,000 pounds; and beyond the fact that petitioner did then have the facilities for drying eggs and the indication that it had met its competition as to that 400,000 pounds, there is no proof of record that at that time the prospective orders of the Surplus Marketing Administration did represent the 3,000,000 pounds suggested in the letter of September 15, or some other widely divergent amount. Furthermore, if the charge-off were to be made according to the formula followed in the *United Profit-Sharing Corporation* case, the determination would, as in that case, be made on a hindsight basis and would require a spread to include at least all orders received from the Government up to April 15, 1945, when the nonnecessity certificate was issued by the Civilian Production Administration, and probably would have to be extended to cover orders from the Commodity Credit Corporation in 1946 and 1947, which would have been far beyond the 6,000,000 pound limit which petitioner seeks to have allowed here. The practical difficulties which would be attendant upon such a course are obvious, particularly when regard is had for the requirements of the statute as to the annual reporting of income and the paying of the tax thereon. It is also to be noted that petitioner has asked for no such deductions beyond fiscal year 1943.

The answer, we think, is that the expenditures here may not reasonably be regarded as the cost to petitioner of the Surplus Marketing Administration orders for 6,000,000 pounds of dried eggs, 3,000,000 pounds, or some other amount, but are more nearly comparable to the cost of surveys preliminary to the organization of any business corporation or venture and the costs attendant upon the organizing and launching of the business. The direction to the petitioner's president and secretary, for whose salaries and expenses most of the $15,239.39 was paid, was that they investigate the "desirability and feasibility" of petitioner entering into "the business of drying and selling dried egg products." The basis therefor, as stated by the chairman of the board of directors, was "that there seemed to be a potential market for dried eggs and that his information was to the effect that the United States Government was or might be interested in purchasing dried egg powder." They were to look into the possible market for such products and the availability of physical plant facilities. According to the testimony of petitioner's president, the plant capacity in the United States for dried eggs at or about the time the petitioner began the production thereof was only approximately 10,000,000 pounds per annum, as against 320,000,000 pounds a year or two after.

It is, of course, true that in 1941 the attitude and plans of the Government were very potent influences in most lines of industrial and business endeavor, but there is no proof or indication that the entry of petitioner into the dried egg field was to be determined by the contingency that the United States should become and, if so, continue to be the major buyer in the dried egg market. The possibility of the Government as a prospective buyer was one factor for investigation, just as were other possible or probable influencing factors. At or about that time, the attitude of the Government in relation to the national defense program was a very real and far reaching force which had to be considered in most plans for launching an enterprise and in procuring the physical facilities therefor, even though the Government might or might not be a potential customer. The petitioner has made no showing with respect to the detail of the expenditures or the purposes thereof beyond their characterization on its books of account, and such detail of expenditures as appears was, according to the minutes of the directors' meeting and statement of petitioner's accountants, made to fit a prior determination that the deferred items were to be charged against the first 6,000,000 pounds of dried eggs sold to the Surplus Marketing Administration, which, as shown above, was not justified on the facts, even under petitioner's theory and application of the rule in the *United Profit-Sharing* case.

Conceivably, there could have been some costs which, in reason, could properly have been chargeable to specific orders or contracts for dried eggs, as contrasted with the costs considered and discussed above, which were made preliminary to and in the setting up of petitioner's dried egg enterprise and which, so far as they did relate to the Government orders, tended to put petitioner in a position where it could compete for orders along with any and all other dried egg producers in the country. But, even so, the orders were still to be obtained by petitioner only by meeting that competition. There is also some suggestion of record that certain of the costs had to do with the obtaining of priorities, presumably for materials and equipment for the setting up of petitioner's plant and possibly some such costs might, in reason, have been chargeable as cost of the plant and thereby have become subject to amortization, under section 124, *supra*. The record indicates, however, that in transferring the items herein from the Construction Account to the "Deferred Development and Pre-Operating Expense Account," petitioner's accountants gave attention to those items which might properly be regarded as the cost of emergency facilities and they were so certified. Insofar, therefore, as the proof shows, the expenditures were preliminary to the entry of petitioner into its dried egg operations and were made in acquiring a capital benefit which, insofar as its life is concerned, is somewhat comparable to organization costs, the corporate franchise, good will, and other nonwasting items which continue through the life of the enterprise. There was no termination or end thereof in any of the years before us. See and compare *X-Pando Corporation, supra*, and other cases there cited.

### 1941 Expenditures Deducted on 1942 Return as Repairs.

The petitioner has submitted no evidence and has made no argument with reference to the items of office supplies, machinery, repairs, and supplies, and it will be assumed that it has abandoned its claim of error on the part of the respondent with respect thereto.

The $516.17 labeled "legal expenses" is made up of two items, a fee of $166.17 paid to Partlow, a practicing attorney, and $350 paid to Hammond, Buschmann, Roll and Alexander. There is every indication that these expenditures were made generally for the same purpose as those heretofore covered in the discussion under the heading of "Deferred Development and Pre-Operating Expense," and there is no proof that they were not. For the reason heretofore stated, it is concluded and held that the respondent did not err in disallowing the deduction of that item for petitioner's fiscal year 1942.

The $700 item labeled "Costs of expired option" is made up of $200 paid out in 1941 in acquiring the option to purchase the property in

Greensburg, Indiana, which option was abandoned in the same year, and $500 paid in acquiring a lease on the Solotkin property, with an option to purchase, which property was adjacent to the property on which petitioner's main plant was located in Indianapolis. Just why $200 of the $500 expended in 1941 for the option to purchase the Greensburg property was entered on petitioner's books as repairs and deducted as such on its return for its fiscal year 1942, while the remaining $300 was deducted on the return for the fiscal year 1941 in the category "Other Deductions" and described as "Building Option Loss (Greensburg)," does not appear. Regardless of such varied treatment, however, we think it apparent that the $200 to be dealt with here was not deductible for 1942 as repairs or under any other classification. The Greensburg option was abandoned in petitioner's fiscal year 1941 and was a closed transaction in that year, leaving nothing to be carried over to 1942.

The petitioner admits that its claim of deduction under Repairs of the $500 paid in acquiring the lease and option on the Solotkin property in 1941 was in error. In its petition, however, it alleged that the deduction is now claimed to cover $500 actually expended in petitioner's fiscal year 1942, the reasons back of the claim being that petitioner had leased a portion of the Solotkin property to an outside party, on the theory that it would not be needed in connection with its dried egg operations, but that in the fiscal year 1942 the property so sublet was needed and the $500 now claimed was expended in buying back the lease. The respondent did not err in disallowing the amount nor in refusing in this proceeding to agree to the allowance of the amount now claimed. The item so expended, if deductible, should be spread over the life of the lease on the property. The petitioner has made no claim for such an allowance and has submitted no proof thereon.

### Compensation of J. W. Nunamaker, Sr.

After careful consideration of the evidence of record as to the services rendered to petitioner by J. W. Nunamaker, Sr., during the fiscal years 1942 and 1943 and with respect to the use of equipment owned by him, it is our conclusion, and we have found as a fact that compensation of $12,000 for the fiscal year 1942 and $6,500 for the fiscal year 1943 was reasonable.

Without argument or citation of authorities, the respondent, on brief, states a further objection to the allowance of the deductions claimed to the extent of $2,900 for the fiscal year 1942 and $6,400 for the fiscal year 1943, which is, that the deduction of the salaries to the extent disallowed is barred by section 24 (c) of the Internal Revenue

Code,[5] in that they were not paid within the taxable years, or within 2½ months thereafter, as required by that section.

The facts show that within the period prescribed in section 24 (c) (3), the petitioner, for each of the years in question, issued its negotiable promissory notes for the balances due J. W. Nunamaker, Sr. The respondent makes no claim that the petitioner was not solvent at all times, or that it did not have sufficient cash on hand to pay the notes, and while his brief was filed as an answering brief and the petitioner had cited and relied upon *Musselman Hub-Brake Co.* v. *Commissioner*, 139 F. 2d 65; *Anthony P. Miller, Inc.* v. *Commissioner*, 164 F. 2d 268; and *Akron Welding & Spring Co.*, 10 T. C. 715, no effort was made to show wherein the decisions in the cases mentioned are not controlling. We think that they are. It is true that in those cases the notes were demand notes, whereas in the instant case the due date of each note was more than 2½ months after the close of the taxable year, but the decisions were not made to rest on that fact. The controlling consideration was that they were given in payment of the compensation obligation and accepted as such. Here, the notes were negotiable and, as in the cases cited and relied on by petitioner, they were given and accepted as payment of the remainder of the compensation due and owing. See and compare *Heatbath Corporation*, 14 T. C. 332, where the facts show that the notes did not become demand notes until 90 days after issue, which, as to 2 notes, was more than 2½ months after the close of the taxable year, and it was held that the above cases were controlling, and that section 24 (c) did not apply. Our conclusion is the same in the instant case.

## *Depreciation.*

The petitioner contends that it is entitled to depreciation allowances for each of the years 1942 through 1945 in excess of those determined by respondent. In support of the contention, the petitioner urges that certain assets in each of the property classifications here involved had expected useful lives that were shorter than the composite life determined by the respondent for their respective classifications and

---

[5] SEC. 24. ITEMS NOT DEDUCTIBLE.

(c) UNPAID EXPENSES AND INTEREST.—In computing net income no deduction shall be allowed under section 23 (a), relating to expenses incurred, or under section 23 (b), relating to interest accrued—

(1) If such expenses or interest are not paid within the taxable year, or within two and one half months after the close thereof; and

(2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and

(3) If, at the close of the taxable year of the taxpayer or at any time within two and one half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under section 24 (b).

that as to them depreciation should be allowed on the basis of their respective expected lives. The respondent takes the position that the petitioner has failed to show that the composite lives determined by him for the various property classifications were erroneous, or that it was otherwise entitled to any greater allowances for depreciation than he has allowed.

So far as appears, the respondent has classified the petitioner's property into the same classifications employed by petitioner in computing and deducting depreciation on its returns. The only apparent difference between the method employed by the petitioner and that used by the respondent is that the respondent has used longer composite lives with respect to the various classifications. The burden is upon the petitioner to show error in the respondent's action and it can discharge that burden only by showing that the composite lives, as determined by respondent, for the assets included in the respective classifications were erroneous. The burden is not discharged by merely showing that certain assets had shorter lives than determined by respondent for the classification in which they were included. *Southern California Freight Lines, Ltd.*, 36 B. T. A. 328, affd., 99 F. 2d 104, certiorari denied, 306 U. S. 632; *Union Co.*, 14 B. T. A. 1310.

In connection with this issue, the petitioner put into the record an exhibit, exhibit 42, purporting to show the various assets in each classification, the date of their acquisition, their cost, the estimated life the petitioner claims herein for them and the life determined by respondent, the amount of depreciation allowable on the petitioner's claimed life, and the amount allowed by respondent for each of the petitioner's taxable years 1942 through 1945. The respondent conceded that the exhibit correctly showed the assets on which he had allowed depreciation, their cost, their estimated life as determined by him, and the amounts of depreciation he had allowed with respect to them in the various taxable years involved. Beyond the foregoing, the respondent made no concession as to the correctness of the matters contained in the exhibit.

Listed in the above mentioned exhibit, under the classification of buildings, are the items "Protective Fence," "Improvements to Solotkin Building," and "Improvements to Lumbermen's Building." On brief, the petitioner contends that the useful lives of these assets were 3½, 19½, and 19 years, respectively, instead of a composite life of 20 years allowed by respondent with respect to these and all other assets included in the classification of buildings. The record contains no evidence as to the nature or character of these items or their useful life, nor as to the composite life of the property in the buildings classification. Under these circumstances, we are unable to find that the

respondent erred in determining a composite life of 20 years for petitioner's properties included in the buildings classification.

In the petitioner's Exhibit 42, part of the items listed under the classification of furniture and fixtures are listed as new when acquired by petitioner and the remainder are listed as used when it acquired them. With the exception of 2 desks, which are assigned lives of 20 years in the exhibit, the petitioner assigns estimated lives ranging from 3 years to 15 years to all items in the furniture and fixtures classification.

On brief, the petitioner contends that no proof should be required to show that used equipment would have a shorter life than new equipment. Relying on certain average useful lives shown in respondent's Bulletin F for items of mechanical office equipment, the petitioner contends that the estimated life assigned in its exhibit to the various items in the furniture and fixtures classification is more nearly correct than the composite life of 15 years determined by respondent for the classification.

To the extent the respondent's determination here is at variance with what is contained in his Bulletin F, it must be concluded that he determined that what is contained there is inapplicable here. As to petitioner's contention respecting the comparative lives of used and new equipment, it is to be observed that the petitioner has submitted no evidence to show that the items listed in its exhibit as used properties at the time of acquisition by it were in fact used properties. Furthermore, if they had been such at the time acquired, that fact alone, and without a showing as to the extent of their use, would not be conclusive that for all practicable purposes their useful life was substantially shorter than new property of like kind.

Since the petitioner not only has not submitted any evidence from which the useful life of any item of property contained in its furniture and fixtures classification might be determined, but also has not submitted any evidence as to the composite useful life of the property in that classification, we sustain the respondent's determination of a composite life of 15 years for the property contained in that classification.

Constituting a part of the petitioner's machinery and equipment were certain dryer equipment and supplementary equipment to dryer. These items were used for drying purposes in the manufacture of the petitioner's dried egg product and comprised component parts of the machinery used for that purpose. In its Exhibit 42 the petitioner assigns to the various items of the dryer equipment and that supplementary thereto lives ranging from $1\frac{1}{12}$ to $3\frac{7}{12}$ years and proposes exhaustion allowances over the taxable years 1942 through 1945 sufficient to completely exhaust the cost of the equipment during 1945.

The petitioner urges that the lives so assigned are proper because of the absolescence sustained over the years in addition to the normal physical exhaustion of the equipment.

In support of its position as to obsolescence, the petitioner contends that after the wartime demand for its product ceased, the equipment lost its economic value and usefulness, that this occurred not later than June 30, 1945, and that thereafter the equipment was worthless and without salvage value and accordingly it should not be determined to have had any life beyond June 30, 1945, for purposes of depreciation.

The evidence does not show that the equipment in question was obsolete and worthless after June 30, 1945, as petitioner contends. The substantial production of its plant in 1946 and 1947 indicated by the sales made in those years to the Commodity Credit Corporation shows that the equipment was usable and was used for the purpose for which acquired. According to the petitioner's exhibit, the equipment was acquired over the years 1941 through 1944, and, so far as shown, was of the latest design when acquired. This equipment, along with the remainder of the machinery and equipment in the petitioner's egg drying plant, has been continued in place and in operating condition and had been operated as and when the petitioner was again producing dried eggs.

In general, obsolescence is a process whereby property, as a result of external causes as distinguished from deterioration in its physical condition, becomes obsolete by losing its economic usefulness for the purpose for which it was acquired, and by being useless for any other purpose. In *Real Estate-Land Title & Trust Co.* v. *United States*, 309 U. S. 13, the Supreme Court enumerated some of the external causes resulting in obsolescence as being changes in the art, loss of trade, inadequacy, supersession, and prohibitory laws. The Court further said, "But in general, obsolescence under the Act connotes functional depreciation, as it does in accounting and engineering terminology. More than non-use or disuse is necessary to establish it."

Examining the petitioner's position in the light of the facts and of the foregoing, it is clear that the equipment was not obsolete and worthless after June 30, 1945. While the petitioner lost trade by reason of the termination of the wartime demand for its product, it sold substantial amounts of its production in 1946 and 1947 to the Commodity Credit Corporation. Worthless equipment could not have produced such substantial quantities of the petitioner's product. There is nothing of record to indicate that during the period over which the petitioner claims obsolescence, or since, there has been any change in the art of manufacturing the petitioner's product or any development which rendered the petitioner's equipment outmoded for the purpose for which it was acquired. The most that has been shown is that since

1945 the equipment has not been used to an extent comparable to that in 1945 and earlier years. However, the equipment has been retained in place, ready for use, if there should be a demand for its use. Neither petitioner nor its officers appear at any time to have contemplated its abandonment prior to the expiration of its normal life. As said by the Supreme Court, more than nonuse or disuse is necessary to establish obsolescence.

A proper basis for an allowance for obsolescence has not been shown, and petitioner's claim therefor is denied.

In its Exhibit 42, the petitioner showed 3 Mobilifts acquired in 1942 and 1 in 1943, and assigned a life of 4 years to them. It showed the Frick Air Cooling Unit as acquired in 1943 and the Frick Cooling Unit as acquired in 1944, and assigned a life of 10 years to them. We have found that the Mobilifts had a life of not less than 10 years, that the fans of the cooling units had a life of 10 years and the coils 15 years. The depreciation deductions claimed by petitioner on its returns were based, not on the individual lives of the various items of machinery and equipment, but on the composite life of the group, and the respondent used the same method in his determination of the deficiencies herein. In the absence, therefore, of a showing that the life of the remainder of the property contained in the classification as well as the life of the above items was such as to bring the composite life of the whole group below 15 years, the determination of the respondent is sustained.

In addition to its claim for added allowances for depreciation for 1943, 1944, and 1945, the petitioner contends that it is entitled to deductions for losses of $864.26 and $573.53, on account of property discarded, junked, or stolen in those years. The parties have stipulated that the respondent disallowed the "charge-off of remaining book values of certain items of machinery and equipment which were junked or discarded." They did not stipulate nor has petitioner submitted any proof as to the amounts thereof or the years involved. Presumably there was no dispute as to the amounts and years affected and it was understood that proper effect would be given thereto in computations under Rule 50. Otherwise there would have been no point to the stipulation.

### Payments for Engineering Services.

The petitioner contends that the respondent erred in disallowing the deduction of $3,000 paid to Boles for preparing the plan and specifications for the rotary table. The respondent contends that the petitioner has failed to show that there was an abandonment of the plan and specifications by petitioner or of the petitioner's plan to build the table in either 1944 or 1945.

Ordinarily, for there to be an abandonment, there must be an intention to abandon, evidenced by some act. Such intention and act are to be ascertained from the facts and surrounding circumstances. Non-user alone is not sufficient. *Minneapolis, St. Paul & Sault Ste. Marie Railway Co.*, 34 B. T. A. 177, and *W. B. Davis & Son, Inc.*, 5 T. C. 1195. It has been held, however, that an act of abandonment alone is sufficient. *Mine Hill & Schuylkill Haven Railroad Co.* v. *Smith*, 184 F. 2d 422. While the evidence shows that the table was not built in 1944, because the required materials were not obtainable then, there is nothing in the record to indicate that in that year or any subsequent year the petitioner or its officers decided to drop the plan to build the table and determined that it would never be built. In *Murphy Transfer & Storage Co.*, 7 B. T. A. 1148, cited and relied on by petitioner, it was shown that the building plans there involved were discarded in the year in which abandonment was claimed. Such a showing is not made here. Apparently the petitioner has continued to preserve intact the plan and specifications involved here. It introduced in evidence an exhibit which was identified as the plan for the table prepared by Boles. So far as appears, the only reason the petitioner has not built the table is that the demand for dried eggs has not been great enough to warrant its construction. From the facts presented, we are unable to find that at any time there has been an abandonment by petitioner of the table plans. The most that appears is a nonuser of the plan and specifications prepared by Boles. That is not enough to sustain the allowance of the deduction sought by petitioner. In *Continental Trust Co.*, 7 B. T. A. 539, also cited and relied on by petitioner, abandonment of the plans in the year the deduction was claimed was established.

The petitioner concedes the correctness of the respondent's determination that the $2,000 paid Boles for preparing plans and specifications for the dried egg conveyor should be capitalized, but contends that the respondent should have made allowance for the exhaustion thereof on the basis proposed in its Exhibit 42, considered under Issue (4), *supra*. Since the conveyor is included in Exhibit 42 as supplementary equipment to dryer, which was part of the machinery and equipment classification of petitioner's properties, and since by our holding under Issue (4) we have disposed of the question here raised by petitioner, no further consideration is required as to exhaustion allowances to be made with respect to the conveyor.

### Payment to James J. Motycke.

We are not in doubt as to the facts relating to this issue, nor as to the over-all result. Motycke disposed of or sold his stock in petitioner and J. W. Nunamaker, Jr., acquired it. The fact that J. W. Nunamaker, Jr., and Motycke agreed in the course of settlement of their

disputes and lawsuits that $35,000 of the consideration flowing to Motycke for the stock should be paid for Nunamaker by petitioner, does not make it otherwise. Neither is its character or substance changed by the wording or formalities of the documents used in the settlement. The payment by petitioner to Motycke was not an ordinary and necessary expense incurred by it in the operation of its business. The respondent's disallowance of the deduction claimed is accordingly sustained.

*Disallowances by Commodity Credit Corporation.*

The issue here is whether the petitioner's income for the taxable years 1944 and 1945 is, under the provisions of section 3806 (a) (2) of the Internal Revenue Code,[6] to be reduced by the amounts of $64,004.94 and $394.40, respectively, as representing the amounts for which petitioner had been reimbursed under contracts with the Commodity Credit Corporation on a cost-plus-a-fixed-fee basis, but which were subsequently disallowed by that Corporation and applied by it as offsets against amounts due the petitioner under other contracts. In support of its position that it is entitled to such reductions, the petitioner relies on our holding in *Cramp Shipbuilding Co.*, 17 T. C. 516, affirmed sub nom. *Harriman Ripley & Co., Successor*, 202 F. 2d 280. While conceding that the amounts in question were withheld by the Commodity Credit Corporation, the respondent contends that there has been no disallowance of any amounts by the Corporation, nor any offset or repayment within the meaning of section 3806. He urges that the amounts withheld were held by the Corporation merely as security for the payment of sums claimed by it to be due from the petitioner, but that the petitioner is contesting the correctness of that claim by suit against the Corporation.

In *Cramp Shipbuilding Co., supra,* we considered at length the provisions of section 3806 (a) (2), and their legislative history. We concluded that with respect to cases coming within those provisions, Congress intended that repayments by contractors under cost-plus-a-fixed-fee contracts are to be related back to the year in

[6] SEC. 3806. MITIGATION OF EFFECT OF RENEGOTIATION OF WAR CONTRACTS OR DISALLOWANCE OF REIMBURSEMENT.

(a) REDUCTION FOR PRIOR TAXABLE YEAR.—

(2) REDUCTION OF REIMBURSEMENT FOR PRIOR TAXABLE YEAR.—In the case of a cost-plus-a-fixed-fee contract between the United States or any agency thereof and the taxpayer, if an item for which the taxpayer has been reimbursed is disallowed as an item of cost chargeable to such contract and, in a taxable year beginning after December 31, 1941, the taxpayer is required to repay the United States or any agency thereof the amount disallowed or the amount disallowed is applied as an offset against other amounts due the taxpayer, the amount of the reimbursement of the taxpayer under the contract for the taxable year in which the reimbursement for such item was received or was accrued (hereinafter referred to as "prior taxable year") shall be reduced by the amount disallowed.

which reimbursable cost items became reportable as income, and that to that extent Congress had changed the general rule of requiring taxpayers to account for each year's operations on the basis of facts known or ascertainable at the end of the year, regardless of what occurred in subsequent years. We further concluded that Congress did not intend by section 3806 (a) (2) to keep a prior year open for eventual reimbursement to a contractor of items previously disallowed and repaid by him. In accordance with those conclusions, we held that where the Navy Department had recouped reimbursable sums from the taxpayer, effect was to be given the provisions of section 3806 (a) (2), even though the taxpayer had instituted suit in the Court of Claims for their recovery.

In the instant case, certain of the petitioner's reimbursable costs for 1944 and 1945 were disallowed. With respect to the disallowances relating to contract FSC (F) 34483, the Commodity Credit Corporation, under its contract with petitioner of February 15, 1946, was authorized to make withholdings from payments due petitioner on deliveries in 1946 and 1947 by petitioner under new contracts, until an amount was withheld which, when added to the amount of the petitioner's performance bond of $25,000, would constitute 100 per cent security for the amount alleged to be due from the petitioner by reason of disallowances relating to contract FSC (F) 34483. The contract of February 15, 1946, provided that the Corporation would pay to the petitioner the amount so withheld and release petitioner's performance bond, if the Department of Justice was not requested within a year from February 15, 1946, to institute suit against the petitioner in the controversy. So far as appears, the only agreement between the petitioner and the Corporation with respect to withholding involved only disallowances relating to contract FSC (F) 34483. However, the Corporation appears to have made withholding not only with respect to disallowances relating to that contract, but to two others made in 1944, and one made in 1945. Whether, or to what extent, this was done under other agreements between the petitioner and the Corporation is not clear from the record. Since the record does not show whether the Department of Justice was or was not requested to bring suit against the petitioner within the year prescribed, or during any other period, the reason why the Corporation did not, pursuant to the contract of February 15, 1946, return the withholdings made as to disallowances relating to contract FSC (F) 34483, is not clear. On the state of the record, it is not clear whether the amounts in controversy here were held by the Corporation as security for the repayment by the petitioner of the items disallowed with respect to the contracts made in 1944 and 1945.

Whatever may have been the purpose of the Commodity Credit Corporation in making the withholdings, we think it is clear that they were accomplished by reason of the disallowed items having been, by the Corporation, "applied as an offset against other amounts due the taxpayer." We do not see anything in the provisions of section 3806 (a) (2) to indicate that the circumstances under which such offsets are made, whether by agreement of the parties or unilaterally by a Government agency, and over the objection of the contractor, affect the application of the provisions. They appear to be equally applicable in either instance. From the facts before us, we think the offsets made by the Corporation fall within the intendment of the section, and we so hold.

*National Builders, Inc.*, 12 T. C. 852, relied on by the respondent, is without application here. That case, as was pointed out in *Cramp Shipbuilding Co., supra,* involved a question of renegotiation under section 3806 (a) (1) of the Code.

*Decision will be entered under Rule 50.*