Mark A. Bird and Phyllis K. Bird v. Commissioner.
Bird v. Commissioner
Docket No. 81407.
United States Tax Court
T.C. Memo 1962-74; 1962 Tax Ct. Memo LEXIS 234; 21 T.C.M. (CCH) 384; T.C.M. (RIA) 62074; April 3, 1962
*234 J. B. Fisher, Esq., Kanawha Valley Bldg., Charleston, W. Va., W. Chapman Revercomb, Esq., and Leslie D. Price, Esq., for the petitioners. Mark H. Berliant, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in income tax and additions thereto against petitioners for the calendar years 1953 to 1956, inclusive, as follows: Additions to Tax
Sec. 293(b)
Sec. 294(d)(2)
Sec. 6653(b)
Year
Deficiency
I.R.C. 1939
I.R.C. 1939
I.R.C. 1954
1953
$10,505.86
$5,252.93
$ 700.11
1954
11,399.53
703.18
$ 5,699.76
1955
6,928.31
3,464.15
1956
7,185.15
3,592.58
Totals
$36,018.85
$5,252.93
$1,403.29
$12,756.49
Certain stipulations were made at the trial, and certain issues have been conceded or abandoned on brief by the parties. The issues remaining for our consideration are: 1. Whether petitioners failed to include certain insurance commissions in gross income; 2. Whether certain deductions by petitioners for business expenses were proper; 3. Whether petitioners are liable for the addition to tax for fraud for any or all of the years herein involved; and 4. Whether petitioners are liable for the 294(d)(2) addition to tax for 1953 and 1954. Findings *235 of Fact Petitioners are husband and wife who resided at Charleston, West Virginia, during the years in issue and who filed joint [1] Federal income tax returns for such years with the district director of internal revenue at Parkersburg, West Virginia. Phyllis K. Bird is involved solely by virtue of the filing of joint returns, and Mark A. Bird will hereafter be referred to as the petitioner. Petitioner has been engaged in the insurance business for 39 years. His formal education extended through grade school, although he has had some training in salesmanship in connection with entering the insurance business. He has had no formal training in accounting. During the years 1953 through 1956 petitioner *236 was engaged in the insurance business in the State of West Virginia. During this period he was "State Manager" in West Virginia for the American Health Insurance Corporation of Baltimore, Maryland (hereinafter called American). This relationship was evidenced by a written General Agency Agreement dated March 1, 1952, providing for a schedule of commissions and providing that petitioner was "General Agent" of American and as such was to be paid or allowed by American "commissions as follows on premiums which [American] receives from or through the General Agent: * * * [descriptions of policies] * * * Policy Fee 100%, Premium for 1st month of coverage 100% * * * [smaller percentages on succeeding month and other 'renewal' premiums]." The contract included Rider #2, which provided: Rider #2, forming a part of the General Agency Agreement with Mark A. Bird dated March 1, 1952. It is understood and agreed that, in addition to commissions as specified in the Schedule of Commissions (including any riders thereto), General Agent shall be entitled to an amount equal to 5% of such premiums collected each month for the 2nd and subsequent months of coverage as are in excess of $30,450. The contract *237 also provided that petitioner could appoint subagents as follows: (2) APPOINTMENT AUTHORITY - RESPONSIBILITY - General Agent shall have authority to appoint subagents and solicitors, provided, however, that such appointments shall be solely for the duration of this Agreement and shall be subject to the Company's prior approval. General Agent assumes full responsibility for and agrees to pay all salaries, commissions, charges and expenses which may be payable to persons so appointed by the General Agent and any other persons through whom the General Agent may procure business for the Company. General Agent shall be responsible to the Company for all moneys collected or handled by persons so appointed and agrees to furnish to the Company a surety bond satisfactory to the Company, in such amount as the Company may require. General Agent is personally responsible for all acts and agreements of persons so appointed by General Agent or of General Agent's employees and agrees to pay the Company upon demand in amounts equivalent to any and all loss resulting from such acts and agreements. and the contract provided further: (4) COLLECTIONS - The General Agent shall have authority on behalf *238 of the Company to collect policy fees and premiums on new policies sold by the General Agency and, when requested by the Company, on policies previously sold. (5) REFUNDS - In event of rejection of an application or cancellation or nonrenewal of a policy by the Company, the General Agent shall refund ratably to the applicant or policyholder any sum due the applicant or policyholder by reason of such rejection, cancellation or non-renewal. If such refund be made by the Company, the General Agent shall account for and pay to the Company such commissions withheld by or paid to the General Agent as are applicable to such refund. (6) RECORDS - REPORTS - The General Agent shall forward to the Company on or before the first day of each month a report, in the form and manner specified by the Company, of all policy fees, reinstatement fees and premiums collected during the preceding month by or through the General Agency, together with a remittance of all policy fees, reinstatement fees and premiums so collected, less specified commissions, and less return premiums as provided in Paragraph Numbered (5) above. [Italics supplied.] * * *
(8) COMPENSATION - EXPENSES - The General Agent shall receive *239 as full compensation for all acts done for, and all business placed with the Company, commissions under such terms and limitations as are set forth in the Schedule of Commissions attached hereto and made a part hereof. Company shall not be responsible for General Agency expenses such as rentals, transportation facilities, clerk hire, solicitors' fees, postage, advertising, exchange, personal license fees, adjustment by the General Agent of losses or claims, nor any other General Agency expenses whatsoever, except as may subsequently be agreed upon in writing. [Italics supplied.] Pursuant to this contract petitioner, as State Manager for American, entered into 17 or 18 general agency agreements with various people throughout West Virginia, and these persons, sometimes called "district agents" or "state agents," caused 97 or 100 subcontracts to be entered into with persons called "agents," "writing agents," or "solicitors." Contracts between petitioner and district agents provided that such agents were to receive 100 percent of the premium for the first month and graduated smaller percentages in succeeding months. Contracts between district agents and writing agents provided that the *240 latter were to receive the entire first month's premium and a smaller percentage of the premiums paid during the next 5 months. In each case the agent who actually wrote the policy was ultimately entitled to the entire premium for the first month. Although petitioner was ultimately entitled to the first month's premium if he made a sale personally, he rarely if ever sold policies personally. The writing agents in West Virginia sent the signed applications to district agents (although one person might serve both functions). Then the policy was sent to the home office. The district agents kept policy record cards to ascertain billing procedure, and the home office kept virtually identical cards. These records indicated the commissions and premiums due. Petitioner, as State Manager, was billed for every policy written by every agent in West Virginia. In instances where the billing was inadvertently made directly to a district agent, it would be sent on by him to petitioner. All net payments to American were made by check from petitioner. Although the gross premium as stated in each policy was treated as gross income by American, a corresponding entry was made for commissions owed or withheld. *241 American looked only to petitioner for payment of all premiums due it. American received no first month's premiums. Subsequent premiums, known as renewal premiums, were sent to it net by petitioner. Respondent has determined from American's home-office records that first month's premiums for all of petitioner's business as State Manager were as follows: Year
Amount
1953
$15,656.35
1954
17,489.70
1955
19,407.30
1956
21,537.16
In each of the years 1953 through 1956, American made a single "bonus" payment to petitioner in addition to all policy commissions. For the above years petitioner received such bonus checks of $6,935.20, $12,748, $8,371, and $8,727, respectively. Respondent determined petitioner's gross income by ascertaining from American's records and from the books furnished by petitioner the total amount of commissions and bonuses earned by each and every agent representing American in West Virginia, including petitioner. Respondent has not objected to the deductions for commissions taken by petitioner excepting certain items discussed below. Petitioner furnished respondent's agents with his books and records for the years in issue, consisting of daily cash sheets, ledgers (except for *242 1953), canceled checks, bank statements, and savings-account pass books. The daily cash sheets contained 11 columns. Column 2 named the insured, column 3 specified petitioner's commission, column 6 listed the total premium paid, column 9 the period of coverage, column 10 named the subagent involved, and column 11 the amount of commission allocated to the agent listed in column 10. All premiums received by petitioner, his agents or collectors were recorded on the daily cash sheets. On commissions with respect to first month's premiums, nothing was entered in column 3 as constituting petitioner's share, as the writing agent was entitled to the entire commission. This was so indicated in column 11. In column 3 the letters "N.B." appeared, signifying new business, or "N.B.W.H." signifying new business in which the writing agent had withheld the first month's premium. These withholdings might continue until the policy had been in effect 6 months. The amounts earned by the agents (column 11) were then posted in the ledger. The amounts of commissions owing were also posted to the ledger, regardless of whether or not any of them had been withheld. Petitioner deducted from his gross income *243 the total commissions listed in the ledger account for each agent, and thus deducted those commissions which agents and subagents had withheld, and which had never come into or passed through petitioner's hands or been returned by him as gross income. Petitioner and/or his district agents and/or any subagents received the following gross amounts as commissions on premiums of American's policies: First Month's
Commissions
Renewal
(Including
ycommis-
those with-
Total Com-
Year
sions
held)
missions
1953
$119,382.75
$15,656.35
$135,039.10
1954
128,865.77
17,489.70
146,355.47
1955
145,165.74
19,407.30
164,573.04
1956
159,933.20
21,537.16
181,470.36
Petitioner reported the following amounts as commissions on his income tax returns: Total from All In-
surance Companies
with Which Pe-
titioner Did
From Amer-
Year
Business
ican
1953
$121,103.26
$119,372.87
1954
131,557.66
128,860.12
1955
155,835.47
153,922.48
1956
182,108.23
179,698.83 The parties have stipulated that commissions from all insurers other than American were properly reported. On March 26, 1953, petitioner deposited in a bank $3,935.20 of his $6,935.20 bonus check dated March 23, 1953, and took $3,000 in cash. On April 10, 1954, he deposited in the same bank $6,748 of his *244 $12,748 bonus check dated April 7, 1954, and took $6,000 in cash. On the same date he paid $1,063.47 in cash to a Charleston, West Virginia, department store. The bonus check dated April 5, 1955, in the amount of $8,371 was cashed 3 days later, and the bonus check dated March 21, 1956, in the amount of $8,727, was cashed on April 4, 1956. When asked by respondent's agents about the disposition of the currency he had obtained from the above checks, petitioner said he had used it to repay loans of $14,000 to J. B. Edwards, $3,000 to Don Maxwell, $6,000 to his father, and $6,000 to his brother. [2] Respondent analyzed petitioner's deposits and found a check from his father for $1,000; a note to Edwards for $5,000 inventoried in Edwards' estate at $2,500 representing a one-half interest; and no other deposits representing the alleged loans. Maxwell loaned petitioner $1,000 in 1947, which loan was repaid within 18 months. Respondent disallowed certain deductions claimed by petitioner as follows: Year
Name
Item
Amount
1953
J. B. Edwards [3] *245 Termination Pay [4]
$1,200.00
1953
T. E. Faust
Commissions Paid
1,766.96
1956
D. R. Butcher
Termination Pay [4]
2,153.72
1956
Wallace B. Sowers
Termination Pay [4]
2,560.10
1956
J. B. Edwards [3]
Interest
1,200.00 J. B. Edwards was an old acquaintance of petitioner. He had been in the hardware and appliance business in Bell, West Virginia. Edwards was not an insurance agent of petitioner, but lent him money and helped him obtain insurance business. Prior to his death on June 29, 1953, Edwards did not receive or earn commissions from petitioner. On *246 September 2, 1953, petitioner gave Edwards' widow a note for $5,000 which she mistakenly signed as comaker. In each of the years 1953 through 1956 petitioner paid her $1,200, and the principal of the note is still due. The obligation represented by the note was subsisting when Edwards died, and the note itself was a renewal of a prior note. One-half of the face amount of the note was appraised in Edwards' estate. Petitioner told the widow that the annual payments were interest. Petitioner deducted the 1953 payment as a commission and the 1956 payment as a business interest expense, which deductions respondent disallowed. No deductions were claimed for the 1954 or 1955 payments. T. E. Faust sold insurance for petitioner from 1940 to January 1952. He never received $1,766.96 of the $2,078.59 deducted by petitioner in 1953 as commissions paid to Faust. Faust owed no money to petitioner at the time of the severance of their employment relationship. Faust received $311.63 in termination pay from petitioner in 1953. D. R. Butcher was an agent for petitioner until 1954 or 1955. In 1956 respondent disallowed a deduction by petitioner for termination pay to Butcher in the amount of $2,153.72. *247 In 1956 Butcher purchased a residence from petitioner, and was given credit on this purchase in the above amount. The deed was recorded in 1957. Butcher reported the sum of $2,153.72 as commission income in his 1956 income tax return. Respondent also disallowed a deduction for termination pay in the amount of $2,560.10 in 1956 made to Wallace B. Sowers, petitioners' son-in-law. No part of this amount was commissions. Sowers and his wife moved to Florida in December 1955 to open a real estate and insurance business. Petitioner was to be a partner, and agreed to pay Sowers' expenses to help get the business started. Six months' residency was required by Florida for a real estate or insurance license, but a year or more is usually needed to establish such a business. Petitioner had purchased an insurance agency from Sowers prior to 1956, and earned at least $583.05 from that agency in 1956. Many of the checks from petitioner were payable to Sowers' wife, and some were in payment of hospital insurance for her. No account for Sowers appeared in petitioner's ledgers or daily cash sheets. Petitioner used a car in his business, driving throughout West Virginia to various offices under his *248 supervision. He spent about 3 days a week on the road. Petitioner lived 4 miles from his office. Petitioner claimed the following amounts as deductions for parking, oil, and gas: Year
Amount
1953
$ 964.83
1954
1,065.18
1955
813.67
1956
900.08 Respondent disallowed one-third of each amount. Petitioner filed declarations of estimated tax for the years 1953 and 1954, estimating tax to be $1,200 and $1,420, respectively. Petitioner filed false and fraudulent income tax returns for each of the taxable years 1953, 1954, 1955, and 1956. A part of the deficiency for each of such years is due to fraud with intent to evade tax Opinion Commissions The major issue is whether petitioner was correct in not reporting in gross income first month's commissions earned by and usually withheld and retained by writing agents in West Virginia. Petitioner had deducted from his gross income all such commissions, whether or not they were retained by the writing agent. Although petitioner's method of keeping records does not clearly reflect income, [5] *249 respondent has not proceeded upon this theory either in the notice of deficiency or in the answer, and we deem that issue not before us. Respondent's method in this case has not been to challenge the propriety of the aforementioned deductions as such, [6] *250 but to insist upon inclusions in petitioner's gross income equivalent to the aggregate of first month's commissions paid to or retained by any and all agents of American in West Virginia, since they were all deducted by petitioner on his returns. Respondent computed the gross commissions paid by American on its West Virginia policies by examining petitioner's records and American's records. Petitioner objected to the introduction in evidence of the gross payments by American on policies procured through petitioner (Exhibit O). Those figures included all premiums and commissions owing from American to petitioner pursuant to the agreement between them, whether received by American or wholly or partially withheld. American included in its income all premium payments due on its West Virginia policies, whether received in whole, in part, or not at all. We cannot agree with petitioner that the admission of Exhibit O is erroneous. We cannot ascertain petitioner's net income from said exhibit, but the figures contained therein are relevant to the amount of gross *251 commissions earned by petitioner pursuant to his contract with American. Since only gross income is disputed, this exhibit is relevant. Petitioner was contractually entitled to receive all commissions due on all of American's policies sold in West Virginia, and American credited such commissions and bonuses computed thereon on that basis. Petitioner had entered into other contracts in which he obligated himself to pay over portions of these commissions to subordinates, and deducted from gross income the aggregate obligation incurred under these other contracts. However, petitioner did not include in his gross income part of the amounts earned pursuant to his contract with American or the bonuses paid pursuant thereto. There is no justification for such exclusion. The instant situation is akin to an assignment of income to discharge an obligation of the assignor, and such income is clearly taxable to the assignor. See Frances E. Latendresse, 26 T.C. 318, 328-329 (1956), affd. 243 F.2d 577 (C.A. 7, 1957), certiorari denied 355 U.S. 830. Were we in doubt as to whether our result (as opposed to the possible denial of the deductions for the commissions withheld) is correct, petitioner's *252 position in West Virginia would reinforce our position. No one not authorized by him and approved by American could sell American's policies in West Virginia. The commissions due any agent leaving petitioner's employ were paid to petitioner. American treated him as responsible for all premiums on its policies from West Virginia, and all net premiums were remitted to it by personal check from petitioner. Under this factual pattern we conclude that all commissions paid or payable by American to petitioner under their contract are taxable to petitioner. Old Colony Tr. Co. v. Commissioner, 279 U.S. 716 (1929). The fact that some of the commissions pertaining to the first month's premiums may have been withheld by the writing agent does not alter our conclusion. The effect of the withholding is the same as if the commissions were sent to petitioner and remitted by him to the writing agents. Frances E. Latendresse, supra.What is significant is that petitioner had the contractual right to receive such commissions, although he had also incurred a parallel obligation under other contracts to disburse them. Therefore they were constructively received by petitioner pursuant to his contract *253 with American, even though withheld by or paid to writing agents. The former fact causes these commissions to be included in gross income; the latter causes them to be deductible therefrom. We perceive no theory under which the bonus payments from American would not constitute gross income to petitioners. Other Deductions Petitioner testified that his automobile was used 90 percent for business purposes. Petitioner owned one car at almost all times during the taxable years before us, except for a relatively short period when he had two. While petitioner's supervisory functions necessitated much travel, we believe from the record that his estimate is high, especially since the cars involved, [7] except as noted, were also used for pleasure. We conclude that the allowable business expenses for the years 1953 through 1956 are $723.62, $798.88, $610.25, and $810.07, respectively. The claimed deductions of $1,200 in 1953 and 1956 for payments made to J. B. Edwards and to his widow are not deductible as business expenses. These claims, per return, were for "termination" commissions *254 and for interest, respectively. No amount as to 1954 or 1955 was claimed per return or pleaded, but petitioner states on brief or pleaded, but petitioner states on brief that "he is clearly entitled to claim same * * * as a business expense deduction." Edwards never sold policies for petitioner nor was he otherwise in petitioner's employ, therefore he was not entitled to any termination pay. Edwards had performed some services for petitioner prior to 1953, and the Edwardses held petitioner's note in the face amount of $5,000, possibly as compensation therefor. These parties seem to have regarded the payments between themselves as interest, although this would make the interest rate 24 percent. The note was not introduced in evidence. Since the 1956 deduction was at least claimed as interest, we find that $300 of that amount constituted deductible interest. Petitioner has not shown us the true nature of the balance of the 1956 payment or of any part of the payments for the other years, consequently he is entitled to no further deduction. Edwards' widow showed little understanding of the nature of the payments, and petitioner offered no testimony to show what the payments constituted, *255 other than claiming them to be past commissions earned by Edwards. Petitioner testified that $1,766.96 was credited in 1953 to a debt owing him from T. E. Faust and was therefore deductible as commission expense. Faust testified that he did not receive such sum and that he was not indebted to petitioner. No evidence or notation of the alleged indebtedness has been shown, and we sustain respondent's disallowance of this deduction. Petitioner deducted the sum of $2,153.72 in 1956 as termination pay (commission) for D. R. Butcher. This amount was credited against the purchase price of a residence purchased by Butcher from petitioner. Butcher took possession prior to 1956 and signed an agreement to buy it. However, he was unable to secure a loan until 1957, and the transaction was completed and the deed recorded in that year. Butcher paid tax on the amount credited in 1956. The parties agree that Butcher earned commissions during 1956, and we are convinced that the crediting of them toward the purchase price of the house occurred in that year. No record of such crediting appears, but we believe petitioner's testimony that credit was given during 1956 as the commissions were earned. The *256 delays in the procuring of financing and in the recording of the deed, due to Butcher's illness, do not disprove petitioner's contention. We conclude that the payment (in the form of reducing the purchase price of the residence) occurred during 1956 and that the deduction therefor was proper. The payment by petitioner of $2,560.10 in 1956 to his son-in-law, Sowers, and to his daughter is not a proper deduction. Sowers testified that no part of the above amount represented commissions earned by him. Part of this amount was for the daughter's hospital expenses, part was payment for an insurance agency transferred from Sowers to petitioner, and part was for aid in the establishment of an insurance agency in Florida. The hospital expenses are personal, the others, capital; all are nondeductible. See Mid-State Products Co., 21 T.C. 696 (1954). Fraud Respondent must prove by clear and convincing evidence that petitioners filed false and fraudulent returns with intent to evade taxes. Powell v. Granquist, 252 F. 2d 56 (C.A. 9, 1958); M. Rea Gano, 19 B.T.A. 518 (1930). Direct evidence of this intent is rare, and fraudulent intent may be proven by attendant circumstances and the conduct *257 of the taxpayer. Many courts have held that known discrepancies between actual and reported income for a period of years constitute sufficiently clear and convincing evidence to justify a finding of the requisite fraudulent intent. [8] As stated in Kurnick v. Commissioner, 232 F. 2d 678, 681 (C.A. 6, 1956), affirming a Memorandum Opinion of this Court: Consistent, substantial understatement of income for several years, as was true here, is highly persuasive evidence of intent to defraud the government. Rogers v. Commissioner of Internal Revenue, 6 Cir., 111 F. 2d 987. See also Holland v. United States, 348 U.S. 121, 75 S. Ct. 127, 137, 99 L. Ed. 150, which held that "evidence of a consistent pattern of underreporting large amounts of income" will support "an inference of willfulness." * * * We have found substantial understatements of income for every taxable year in issue here. Petitioner earned three distinct types of commissions: First month's commissions, renewal commissions, and bonus commissions. In both 1953 and 1954 the total commissions from American which *258 were reported in petitioner's income tax returns were within a few dollars of the renewal commissions paid to petitioner by American. During these years petitioner deducted all of the first month's premiums earned by agents under his supervision, sending statements in those total amounts to each agent, whether or not such commissions had been withheld by the agent. Yet although these commissions were earned pursuant to his contract with American, they were not included in income. And in both of these years he received bonus checks which were never entered in the cash receipts books nor included in income. The 1954 bonus check alone exceeded petitioner's reported net profit from business. In 1955 reporting of only renewal commissions would have led to a minimal profit, and a sum approximately equal to the 1955 bonus check was added to gross receipts, although the bonus check was not recorded in petitioner's books and records. In 1956, after respondent had begun to examine petitioner's returns, gross receipts reported exceeded renewal commissions and bonuses. In all years involved herein, reported gross income was in a consistent ratio to net profit. If in 1956 only renewal commissions *259 had been reported, a loss would have resulted. We conclude from the entire record that petitioner was aware of the understatements of income. He had been in the insurance business for 39 years, made entries in the books personally, showed a thorough knowledge of his books and records on the witness stand, and usually determined what items were charged to his drawing account. Petitioner's bookkeepers were instructed to present records to his accountants. However, petitioner withheld his bonus checks from his books, knowing that the preparers of his returns would be unaware of the existence of such checks. See Leo L. Lowy, 288 F. 2d 517 (C.A. 2, 1961), affirming a Memorandum Opinion of this Court, certiorari denied 368 U.S. 984 (1962). Petitioner thereafter signed his Federal income tax returns without inquiry after deliberately having concealed the receipt of bonus checks. The error was not patent, as in E. S. Iley, 19 T.C. 631 (1952), cited by petitioner. Petitioner relies on cases in which careless bookkeeping ignorance and naivete have been deemed insufficient to constitute fraud, e.g., Walter M. Ferguson, Jr., 14 T.C. 846 (1950); E. S. Iley, supra. However, the instant case *260 reveals a pattern of reporting gross income too well conceived to be attributable to oversight. Petitioner deducted all commissions earned by his agents, including first month's premiums, whether withheld by the writing agent or not. [9] He was responsible to American for all such premiums, and his bonus was presumably based upon such premiums. Yet he did not report these premiums as income until his past returns were being audited, and even then only to the extent necessary to keep a fairly constant ratio between gross receipts reported and net income reported for the 4 years before us. In addition, petitioner attempted to conceal the existence of his bonus checks. Viewing the entire record, we believe that respondent has proven by clear and convincing evidence that petitioner's returns for all years involved herein were false and fraudulent with intent to evade tax, and that at least part of the deficiency for each of these years is due to fraud. Therefore assessment in none of the years is barred by the statute of limitations. Section 276(a), Internal Revenue Code of 1939; *261 section 6501(c)(1), Internal Revenue Code of 1954. Petitioner has apparently abandoned his objection to the section 294(d)(2) addition to tax. His pleadings raised reasonable cause as a defense, and although we feel such a defense is without merit, no reasonable cause was shown and the additions to tax are sustained. Petitioner objected to the introduction of Exhibit P, a reconstruction of net income made by respondent and based on net commissions to petitioner less his expenses. While petitioner's objection to this exhibit makes much noise but little sense, we have arrived at our conclusions without reliance on Exhibit P. Petitioner apparently has conceded a claimed capital loss disallowance of $237.50 and a disallowed commission expense to J. B. Farmer of $741.20, both in 1955, as the evidence of record is de minimis and no argument relative thereto was made on brief. Decision will be entered under Rule 50. Footnotes
1. Petitioner Phyllis K. Bird did not sign the 1956 return although it purported to be a joint return. Respondent has determined that the 1956 return was a joint return, and the petition so alleges. We have therefore found that Phyllis consented to the return in evidence being treated as a joint return. See Myrna S. Howell, 10 TC 859 (1948), affd. 175 F. 2d 240↩ (CA-6, 1949). Phyllis has not pleaded or argued that she is not liable for any 1956 deficiency because of her failure to sign the return.
2. These loans total $29,000. Excluding the deposits of 1953 and 1954 and the 1954 payment to the department store, the maximum amount of currency petitioner had available for his use was $25,000.↩
3. On his 1956 income tax return, petitioner deducted the amount of $1,200 paid to Edwards as business interest. On brief he argues that he is entitled to deduct $1,200 in each of the years 1953 to 1956, inclusive, as termination pay paid to Edwards. His brief is sufficiently vague, however, that we are unable to conclude that he has abandoned his 1956 claim for an interest deduction. 4. Petitioner introduced a typical contract between himself and a district agent and a typical contract between a district agent and a writing agent. Both contracts contained a "Supplemental Termination Agreement" providing for certain continued commission payments, under certain conditions, to the district agent (or, in the latter contract, the writing agent) after the termination of the agency relationship. No separate records of "termination pay" were kept by the petitioner.↩
5. Section 446(b), I.R.C. of 1954, provides: SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING. (b) Exceptions. - If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.↩
6. Petitioner claims surprise, alleging that the notice of deficiency did not inform him that respondent was, in effect, disallowing deductions. The pertinent part of said notice of deficiency relating to the year 1953 reads as follows: (a) Additional Commissions It is determined that you received income from Commissions during the taxable year in the amount of $143,704.69 in lieu of the amount of $121,103.26 reported in your return. Therefore, adjusted gross income is increased by the amount of $22,601.43 as computed in Exhibit A attached hereto. Similar explanations were given for the adjustments in the other years at issue. The only commissions disallowed, as such, were those to Edwards, Faust, Butcher and Sowers, as stated in our findings. We are unable to believe that this deficiency notice misled petitioner or is inapplicable to the facts as proven.↩
7. Petitioner purchased a new business car in December 1955, and traded it for another new car in December 1956.↩
8. E.g., Romm v. Commissioner, 245 F. 2d 730 (C.A. 4, 1957); Baumgardner v. Commissioner, 251 F. 2d 311↩ (C.A. 9, 1957).
9. Petitioner usually sent each collector or agent a Form 1099 showing all commissions, including those withheld.↩