## DE LAVAL STEAM TURBINE CO. *v.* UNITED STATES.

No. 6.   Argued October 16, 1931.—Decided November 23, 1931.

*Mr. John Spalding Flannery,* with whom *Messrs. George C. Holton, George F. Losche,* and *Frank F. Nesbit* were on the brief, for petitioner.

62

64

*Assistant Attorney General Rugg,* with whom *Messrs. Arthur Cobb, Bradley B. Gilman* and *Erwin N. Griswold* were on the brief, for the United States.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

Petitioner, a manufacturer of marine steam turbines, prior to January 12, 1918, had entered into thirteen written contracts with various firms and corporations for the manufacture of steam turbine propulsion units for ships. In the early part of 1918, after petitioner had commenced work under the contracts, the United States, acting through the Emergency Fleet Corporation, requisitioned these contracts, and advised the parties that it would make just compensation for the turbine equipment which the petitioner was required to complete, and that the Emergency Fleet Corporation would assume the responsibility of the contracts and make payment to petitioner.

The present controversy concerns three of these contracts (the other ten having been fully performed), the first for the construction of four marine turbine sets at the contract price of $150,000, the second for the construction of ten marine turbine sets at the contract price of $735,000, and the third for the construction of four marine turbine sets at the contract price of $216,000. Petitioner continued to perform its obligations under these contracts as directed by the Fleet Corporation, for about a year, at which time, following the signing of the Armistice, it became necessary in the public interest to suspend op-

erations under the contracts, and, upon the several orders of the Fleet Corporation, petitioner suspended operations, stored the materials on hand, which had been assembled for the performance of the contracts, until January 14, 1920, when, by agreement, they were released from the effect of the requisition and were taken over by petitioner at an agreed salvage value.

The Fleet Corporation awarded compensation to petitioner, but the latter thought the award insufficient and sought by this suit in the Court of Claims to have the amount of just compensation determined. The Court of Claims gave judgment in favor of petitioner for its actual costs and expenditures over the cash payments received, amounting to $116,231.66, together with $30,000 damages for extraordinary expenses resulting from the stopping of work, and $15,000 for expenses and rental incident to the storing of materials during the period after the order to stop work. From the total of these items, certain deductions, including a payment by the Fleet Corporation of 75% of the amount which it had awarded, were made, resulting in an award of $84,074.34, with interest thereon from August 17, 1920. To this award the court added $8,500, with interest from March 17, 1919, as the value of the three contracts at the time of their cancellation, and the loss sustained by the petitioner by reason thereof. According to the findings, the petitioner, if it had been allowed to complete the performance of the three contracts, would have realized a profit of over three hundred thousand dollars. But the court below declined to include any amount for anticipated profits. 70 Ct. Cls. 51.

The sole question presented for our determination is whether petitioner was entitled to an allowance of the amount, or any part of the amount, of these anticipated profits as a part of the just compensation.

In *Russell Motor Car Co. v. United States*, 261 U. S. 514, the contract involved had been made directly with the government for the manufacture of certain war supplies. Following the Armistice, and while the contract was in process of being performed, the Secretary of the Navy directed its cancellation. Suit was brought in the Court of Claims to recover just compensation. That court found that if the manufacturer had been permitted to complete the contract according to its terms, a very large amount would have been earned as profits, but refused to include in its award any part of these anticipated profits. We affirmed this determination and held that the statute, which empowered the President "(b) to modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships or material," applied to the government's own contracts as well as to private contracts, and that just compensation for the cancellation of such contracts should include " the value of the contract at the time of its cancellation, not what it would have produced by way of profits for the Car Company if it had been fully performed."

A distinction is sought to be drawn between the *Russell Company* case and the present case on the ground that there the contract was made directly with the government, and here they were made between private parties. The question, therefore, is whether this circumstance alters the rule in respect of just compensation. In determining that question the cardinal point to be borne in mind is that whether the contract requisitioned or canceled be one with the government or one between private individuals, the person whose property rights are taken or destroyed is entitled to receive just compensation, not damages as for a breach. A sufficient ground for the distinction lies in the fact that in the one case the requisition or cancellation is a

lawful act under the power of eminent domain, while in the other the act constituting the breach is unlawful.

In the present case the government requisitioned the purchasers' rights in the contracts, not for the purpose of putting an end to the contracts, but of keeping them alive for the benefit of the government. Its action being in pursuance of law, the government succeeded to all the rights of the purchasers under the contracts. The effect was the same as though the contracts had beeen assigned by the purchasers with the consent of the manufacturer. There resulted, by operation of law, a substitution of purchasers, and the government became possessed of the right to enforce the contracts as though it had been an original contracting party. In effect, the old contracts became new contracts between the government and the petitioner. See *F. Haag & Bro.* v. *Reichert,* 142 Ky. 298, 301; 134 S. W. 191. Compare *Wiggins Ferry Co.* v. *Ohio & M. Ry. Co.,* 142 U. S. 396, 408; *Chicago, R. I. & P. Ry. Co.* v. *Denver & R. G. R. Co.,* 143 U. S. 596, 608.

In this view, the government canceled its own contracts, and it is hard to see why the *Russell Company* case is not strictly applicable. Moreover, the Act of June 15, 1917, c 29, 40 Stat. 182, authorized the President to cancel " *any* existing or future contract," etc., and this language, as we have held, applies whether the contract is with the government or between private parties. In either case, cancellation is an exercise of the power of eminent domain, and the liability of the government is for just compensation. There is no warrant for saying that the elements to be considered in fixing just compensation are different in respect of the two classes of contracts. The *Russell Company* case dealt with a government contract, but *Brooks-Scanlon Corp.* v. *United States,* 265 U. S. 106, involved the requisition of a private contract, and this court, holding that the claimant was entitled to just compensation, defined the term as follows (p. 123):

"It is the sum which, considering all the circumstances—uncertainties of the war and the rest—probably could have been obtained for an assignment of the contract and claimant's rights thereunder; that is, the sum that would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy."

Obviously, this does not justify the allowance of anticipated profits, although, of course, the fact that the contract, if carried out, would be profitable is one of the circumstances which naturally would be considered by one seeking an assignment of the contract, and must be given its proper weight in fixing just compensation. But that is very different from an *allowance* of anticipated profits as in the case of a breach. Whether the contract taken or canceled is one with the government or is a private contract, the result of the two cases is that just compensation means the same—" the value of the contract at the time of its cancellation, not what it would have produced by way of profits . . . if it had been fully performed." *Russell Motor Car Co.* v. *United States, supra,* p. 523.

The court below found that the value of the contracts at the time of their cancellation and the loss sustained by reason thereof was $8,500, and in its judgment included this amount as a separate item. In the course of its opinion the court said (p. 65) that the amount of this item was to be determined " from all of the facts and circumstances in the case which bear thereon, as shown by the evidence, and [the court] has fixed the amount thereof in the findings at $8,500." The amount, it is true, seems small, but the evidence is neither before us nor open for our consideration, and there is nothing in the findings which would justify this court in saying that the court below did not give weight to all proper elements entering into the determination of the amount of just compensation, including the fact that large profits would have

resulted from the full performance of the contract. To what extent, in the opinion of the lower court, the realization of profits was rendered highly improbable by other facts and circumstances does not appear and is not open to speculation. We perceive no basis for substituting our judgment in the matter for that of the court below.

The fact that the contracts were made prior to the passage of the Act of June 15, 1917, does not alter the situation. They were entered into subject to the power of Congress to enact legislation authorizing the government to take them over for its benefit, or to modify, suspend or cancel them, as required by the necessities of war, and an implied condition to that effect must be read into the contracts. See cases cited in *Omnia Co.* v. *United States,* 261 U. S. 502, 511–513. Congress, in the exercise of its lawful powers, provided by the act for such taking over, etc., and expressly included " existing " as well as " future " contracts. Whether the contracts here involved were entered into before or after the passage of that act, therefore, becomes immaterial. It is true that in the *Russell Company* case the contract was after the statute and it was said that the contract was entered into with the prospect of its cancellation in view, since the statute was binding and must be read into the contract; but it was not intended thereby, in the face of the precise terms of the statutory provision, to include within the reach of the implication only future contracts and exclude therefrom existing contracts. The contract there and the contracts here were entered into not only subject to statutes already in force, but to those which should thereafter be passed. *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467, 480. In that case this court held that the prohibition of the Act of February 4, 1887, c. 104, § 2, 24 Stat. 379, as amended, prohibiting a carrier from charging compensation differing from that specified in its published tariff, meant that transportation should be paid for by all alike

and only in cash, and that it had the effect of rendering invalid a contract, valid when made, for the issue of free transportation. The court said (p. 482):

"The agreement between the railroad company and the Mottleys must necessarily be regarded as having been made subject to the possibility that, at some future time, Congress might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable or to impair its value. That the exercise of such power may be hampered or restricted to any extent by contracts previously made between individuals or corporations, is inconceivable. The framers of the Constitution never intended any such state of things to exist."

There is nothing in the findings or in the circumstances to suggest that the manufacturer sustained any injury from the requisition itself, since the government undertook to carry out the contracts and its credit was certainly not inferior to that of the original purchaser. The injury resulted not from the requisition, but from the subsequent cancellation of the contracts.

*Judgment affirmed.*