## WHITLOW et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10416.

Circuit Court of Appeals, Eighth Circuit.

March 16, 1936.

**570**

[redacted]

J. B. Grice, of Washington, D. C., for petitioners.

Harry Marselli, Sp. Asst., to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., and S. Dee Hanson, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

STONE, Circuit Judge.

This is a petition to review a deficiency redetermination of the Board of Tax Appeals as to the income tax of R. H. Whitlow for the year 1927. The taxpayer having died, this petition is by the administrators of his estate.

The controversy concerns the taxable profits from a sale of the stocks, interests, and liabilities of the taxpayer in certain insurance companies made in 1927. Prior to the sale, the taxpayer, J. W. Walker, and J. E. Felker were equal owners of the entire stock and interests in such companies. The sale was to Walker and Felker for a consideration of $150,000 of which one-half was cash and one-half in seventy-five promissory notes of the purchasers for $1,-000 each, due monthly over seventy-five months. The dispute here is as to the value of these notes as part consideration of the sale in 1927. The notes were not returned for taxation in 1927. The Commissioner determined they were worth face value. The petitioners contend they had no taxable value at all or, at most, not more than one-third of face value. The Board sustained the Commissioner.

The statement in the opinion of the Board is as follows:

"The respondent has found that the promissory notes received by the decedent in 1927 were worth their face value when received and his finding in this respect is prima facie correct and must continue to be until overcome by a showing on the part of the petitioners to the contrary. We have the bare statements of two witnesses that those notes had no market value in 1927

571

but their testimony lacking, as it does, details upon which they based their conclusions so that we might form some independent opinion upon the subject matter ourselves, and in the face of the fact that there has never been a default—on the contrary the notes have all been paid at each maturity date—is far from convincing. One of the witnesses, who so testified, qualified his testimony by saying that he did not mean that the notes did not have a value of some kind—that he merely meant that they were not the type of notes ordinarily sold in the open market. He said it was reasonable to expect that the notes would be paid, depending upon the future success of the company. There is nothing in the record to indicate that it was not entirely reasonable to expect the successor companies to continue to be as successful as their predecessors had been. In this particular we must, upon the record, sustain the respondent's determination."

■ Petitioner's argument is divided into eight headings. One of these is that the findings of ultimate facts are not responsive to the issue. The ultimate fact found by the Board was to sustain the determination of the Commissioner that the notes were worth face value. There is no force in this contention.

■ Three of the other matters argued have to do with particular matters concerning the evidence. One of these is that the Board should not have considered evidence of matters subsequent to 1927 bearing on the value of the notes in 1927, meaning thereby evidence that the notes coming due (sixty out of the seventy-five) were promptly paid when due. The inquiry is as to the value of the notes in 1927. Where the search is for "value," the courts are rather generous in permitting introduction, even in trials before courts, of all evidence having any bearing on the matter. Generally speaking administrative or quasi judicial bodies are allowed even to depart from the rules of evidence enforced in the courts. While evidence that notes are promptly paid is by no means conclusive of the value of the notes when made, yet it certainly has some bearing upon their value at that time. Such bearing is strengthened where, as here, these payments began shortly (one month) after the notes were made

and continued at similar brief intervals. The solvency of the maker of a note at the time the notes are made and afterwards is a vital factor in the value and the estimate of value thereof. These payments, three of which were in 1927, bore upon such solvency.

■ A second matter is stated as "The Board should as a duty take judicial notice of things relevant to the issue, and petitioners should not be required to prove a negative." The argument under this heading in the brief is entirely made up of statements as to a number of matters of which courts have taken judicial notice; such being, in the main, supported by citations. Nowhere are we apprised of the particular matters of fact or evidence here involved which petitioners think the Board should have judicially noticed. Some of the matters set forth as being the subject of judicial notice *might* be pertinent here, and others seem entirely foreign. We do not feel called upon to search among all of these and determine a pertinency and application which counsel has not sufficiently discovered to make clear. No argument is made in support of the contention that proof of a negative should not be required; no convincing argument to that effect could be made where, as here, the burden was on petitioners to prove that the Commissioner's determination of value was not sound.

■ The third matter is that the "testimony of witness should be considered as a whole, and uncontradicted evidence should not be ignored." The first part of this contention is leveled at the statement by the Board that "one of the witnesses, who so testified (that in his opinion there was no market value) qualified his testimony by saying that he did not mean that the notes did not have a value of some kind, that he merely meant that they were not the type of notes ordinarily sold in the open market." The argument is that the witnesses did not mean that the notes were worthless, but only that they had no salable value. It is difficult to discern any substantial distinction between this statement of the Board and the statement in the argument. If it is meant that the applicable statute,[1] in using the term "fair market value," restricts tax liability to such property as has a value in recognized market channels, the contention

---

[1] The Revenue Act of 1926 (44 Stat. 9, 11) § 202 (a) and (c) is as follows (italics inserted):

"Sec. 202. (a) Except as hereinafter

provided in this section, the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in subdivision

is not well founded. To adopt such restriction would narrowly limit the property so subject to taxation to the manifest violation of the intent of the statute. The intent of the statute clearly is to measure the amount realized from the disposition of the property by the value of the entire receipts—cash and other property. "Fair market value" is the measure to be applied to property other than money. Fair market value is a term and a measure long used in the law as applicable to property having no actual current market place [see Olson v. United States, 67 F.(2d) 24, 29 (C.C.A. 8)], and this statute uses the term thus broadly. So used, its definition is "the sum that would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy." De Laval, etc., Co. v. United States, 284 U.S. 61, 72, 52 S.Ct. 78, 80, 76 L.Ed. 168; Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 123, 44 S.Ct. 471, 68 L.Ed. 934; Olson v. United States, 67 F.(2d) 24, 29 (C.C.A.8). Any property which is the subject of sale is within the statute. Where the property is of a class, such as listed stocks and bonds, live stock, grain, etc., which has established markets where there are daily dealings, the "fair market value" is more easily and more accurately ascertainable, but the difference between such class and others is not that of the existence vel non of a "fair market value" but is solely one of the character and extent of proof.

The second part of this contention relates to the opinion of the witnesses that the notes had no market value in 1927. Petitioners concede that the Board may reject opinion testimony as to value, but insists that this cannot be done "unless the Board has better experience, facts or knowledge from which to form an independent opinion on the matter," citing Planters' Operating Co. v. Commissioner (C.C.A.8) 55 F.(2d) 583, 585; Dempster Mill Mfg. Co. v. Burnet, 60 App.D.C. 23, 46 F.(2d) 604, 606; Nichols v. Commissioner (C.C.A.3) 44 F.(2d) 157, 159; Pittsburgh Hotels Co. v. Commissioner (C.C.A. 3) 43 F.(2d) 345, 347; Boggs & Buhl v. Commissioner (C.C.A.) 34 F.(2d) 859, 861; Citrus Soap Co. v. Lucas (C.C.A.9) 42 F.(2d) 372, 373. We need not determine the

accuracy of this statement as a rule of law, since the Board clearly had before it, as we will hereinafter show, abundant facts in the evidence to justify its conclusion as to the value of these notes.

The four other contentions may be treated together as amounting to a challenge of the sufficiency of the evidence to justify the finding of the Board as to value of these notes. In a review of action of the Board of Tax Appeals, where the challenge is as to the sufficiency of the evidence to sustain the findings of the Board, this court is confined to examination of "whether there was substantial evidence before the Board to support the findings made." Helvering v. Rankin, 295 U.S. 123, 131, 55 S. Ct. 732, 736, 79 L.Ed. 1343. The finding of fact with which we are here concerned is that of the ultimate fact that the notes were worth face value in 1927. The Board entered its investigation faced by the presumption that the determination of the Commissioner that such value existed was correct—that is, such determination made a prima facie case which threw the burden of proof to the contrary upon the taxpayer and which survived until overthrown by such proof. Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623; Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 271, 50 S.Ct. 263, 74 L.Ed. 848; Wickwire v. Reinecke, 275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184.

The evidence preserved in this record consists of testimony of two witnesses and the report of the internal revenue agent. There was other evidence which the parties have omitted, presumably because they regarded it as concerned only with another matter before the Board but not brought here. However, there is one table contained in the findings of fact relating to the annual income of decedent from several of these insurance companies which petitioners expressly accept in their brief (page 14), and therefore we feel free to treat as matter of fact before the Board.

An outline of this evidence shows the following: The taxpayer organized the Mutual Aid Union in 1907, which was a somewhat novel plan of life insurance worked out by him. As to the type of insurance written, Mutual Aid Union wrote a

(a) or (b) of section 204, and the loss shall be the excess of such basis over the amount realized. * * * *

"(c) The amount realized from the sale or other disposition of property shall be the sum of any money received *plus the fair market value of the property (other than money) received.*"

certificate based upon the assessment list; the membership was grouped into rolls or "circles" of one thousand members, and the basis of assessment was fixed to be levied against each member upon the death of a member in that circle. In case of death during the first six months of the life of the policy, the amount paid the beneficiary would be $75. A policy increased $12.50 a month up to and including the eightieth month, when it reached its maximum amount of $1,000. Under the plan of the organization, what was left over after the operating expenses were paid, the officers and directors had as their compensation; the by-laws so provided.

That part of the business of Mutual Aid Union written in Oklahoma was, to comply with the insurance laws in that state regarding assessment companies, done under a charter from that state, under name of Mutual Aid Union of Oklahoma; and, for the same reason, the business done in Illinois was under a charter from that state under the name of Mutual Aid Union of Illinois. Except for that difference, the business done in those states was handled the same as that in Arkansas, with the same directors and officers, and in the same building, at Rogers, Ark.

J. W. Walker acquired an interest in the Mutual Aid Union in 1910, and J. E. Felker acquired an interest in 1911. From September, 1911, up to September 14, 1927, when Whitlow sold out, the stock and ownership of each and all of the above-mentioned companies was held by R. H. Whitlow, J. W. Walker, and J. E. Felker, in equal parts, and, for that period of time, they were the directors and the officers. To do the printing of the policies and other required matter for all these companies, the print shop, in the basement of the building, was incorporated in 1911, under the name of Press Publishing Company, with capitalization of $5,000.

In 1920, Whitlow, Walker, and Felker started, at Rogers, Ark., an old line reserve stock insurance company, called Union Life Insurance Company.

In June, 1925, Mutual Aid Union of Oklahoma and Mutual Aid Union of Illinois surrendered their charters and Progressive Life Insurance Company, of Rogers, Ark., a stipulated premium company, was created by R. H. Whitlow, J. W. Walker, and J. E. Felker, and it assumed the obligations and took over, by a reinsur-ance agreement, the policies that were in the name of those two retiring companies, and subsequently wrote only stipulated premium policies.

On December 6, 1926, Union Aid Life Insurance Company, a stipulated premium company, was organized by Whitlow, Walker, and Felker, and it, under a reinsurance agreement, on December 14, 1926, assumed and undertook to carry out the contracts (policies) between Mutual Aid Union of Arkansas and its members, collect the premiums and pay the claims, all in accordance with the by-laws of the Mutual Aid Union. Mutual Aid Union of Arkansas surrendered its charter and ceased to do business, on April 1, 1927.

As individuals, they, in 1914, constructed a two-story brick building at Rogers, Ark., at a cost, together with the land and office furniture and equipment, of about $81,000. They exchanged this property for the entire capital stock of Union Life Insurance Company when that company was organized in 1920. This building, known as Mutual Aid Union Building, housed and was the place of business of each and all of the aforementioned companies.

From his one-third ownership in the Mutual Aid Union and its above-mentioned subsidiary companies, R. H. Whitlow received income as follows: In 1913, $8,237; in 1914, $10,150; 1915, $10,208; 1916, $15,925; 1917, $11,800; 1918, $9,815; 1919, $15,700; 1920, $26,599; 1921, $28,250; 1922, $28,000; 1923, $30,000; 1924, $27,167; 1925, $23,250; 1926, $25,000. Prior to 1913, the organization had not been in business long enough for the death rate to be high; therefore there was no profit for the organizers. There had to be sufficient age on the policies, owing to the plan by which they increased $12.50 a month, in order for it to be a paying proposition for the directors and organizers.

In 1927, the taxpayer with others filed an action in a state chancery court against Walker, Felker, and others concerning the conduct of the businesses. Apparently, it was this disagreement between the three owners which resulted in this sale, on September 14, 1927. One of the two witnesses (Duty) would not venture an estimate of the value of this insurance stock beyond saying, "I understood it was valuable." The other witness disclaimed knowing whether the taxpayer received more than the value of the stock. The same witness testified as follows:

"Q. As a matter of fact, don't you think it was a reasonable expectation that these notes would be paid as they became due, if that expectation had been made at the time of the sale in 1927? A. Depending upon the success of the companies.

"Q. If they continued to be as successful as they had been in the last five years, say, it would have been reasonable to suppose they would have been paid? A. Yes, sir, if they continued with their success."

The amount and kind of insurance in force in the entire group of companies about the time of the sale by R. H. Whitlow of his stock and interest, and also the amount at different dates carried by the Mutual Aid Union during the period of its growth, is indicated below:

Mutual Aid Union of Arkansas (began business in 1907). December 31, 1908, number of policyholders, 2,315; December 31, 1910, number of policyholders, 6,233; December 31, 1911, number of policyholders, 12,027; December 31, 1912, number of policyholders, 18,000; December 31, 1915, number of policyholders, 49,152; December 31, 1917, number of policyholders, 54,-690; December 31, 1926, number of policyholders, 33,059; August 31, 1927, number of policyholders, 29,403.

Union Life Insurance Company (began business in 1920). August 31, 1927, number of policyholders, 4,405; December 31, 1926, amount of insurance in force, $5,427,-364; January 1, 1926, amount of insurance in force, $5,651,200; amount of new insurance written during year 1926, $2,524,162; apparent amount of insurance expired during 1926, $2,747,998.

The cost was $1.38 for every $1 of premium during the year 1926; and this company would not have shown an operating profit if the salaries and commissions had not been paid by the Mutual Aid Union.

Progressive Life Insurance Company (began business June 30, 1925). August 31, 1927, number of Mutual Aid Union of Oklahoma policies, 7,967; August 31, 1927, number of stipulated premium policies, 6,-143.

Union Aid Life Insurance Company (began business December, 1926). August 31, 1927, number of stipulated premium policies in force, 11,169.

The local banks would not take these unsecured long-term notes, and none has been sold. They could have been sold as commercial paper if a buyer could be found. Both witnesses testified that the notes had no market value in the sense that "you could not go out on the market and sell them for par or anywhere near it." The makers had little property (rough land and their homes) beyond the insurance stocks and interests; each owning one-half thereof after the sale.

■ *Summing up the Above Evidence.* The *opinion* evidence of the witnesses was to the effect that there was no ordinary commercial market for long-time unsecured notes, and that any sale thereof would have to be to some buyer outside the regular channels. The result of this would be that there would be no current prices by which market value could be determined. "In such situations, the definition of market value is 'the sum that would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy.'" Olson v. United States (C.C.A.) 67 F.(2d) 24, 29, quoting from De Laval, etc., Co. v. United States, 284 U.S. 61, 72, 52 S.Ct. 78, 76 L. Ed. 168.

Obviously, the main factor in so determining the value of these notes would be the probability of their being paid when due. Viewing the situation as of a buyer in 1927, the above evidence is that these two makers had, in 1926, earned from these businesses $25,000 each; that the businesses were successful; that "it would have been reasonable to suppose" the notes would be so paid if the businesses continued to be "as successful as they had been in the last five years"; that, instead of the makers having third interests and ownership each, they would have one-half interest and ownership and participation after the sale; that the three notes coming due in 1927 were promptly paid; that there was no suggestion of insolvency or inability of the makers to meet the notes.

■ Accepting the opinion evidence as to market for the notes and considering the above evidence as to probability, in 1927, of payment, it cannot be said that there was not "substantial evidence before the Board to support the findings made" (Helvering v. Rankin, 295 U.S. 123, 131, 55 S. Ct. 732, 736, 79 L.Ed. 1343) that the notes were worth face value. Such evidence falls far short of dissipating the prima facie determination to that effect made by the Commissioner.

The determination of the Board is supported by substantial evidence. Therefore, that determination is affirmed.