NATIONAL UTILITY PRODUCTS COMPANY, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent HAROLD M. and ANN T. BOWMAN, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
NATIONAL UTIL. PRODS. CO. v. COMMISSIONER
Docket Nos. 275-75, 276-75.
United States Tax Court
T.C. Memo 1978-494; 1978 Tax Ct. Memo LEXIS 18; 37 T.C.M. (CCH) 1851-18; December 13, 1978, Filed Larry Crystal and Daniel R. McCarthy, for the petitioners. Larry L. Nameroff, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Addition to Tax [1] Petitioner
Year
Deficiency
Under Sec. 6651(a)
National Utility
1969
$ 3,266
Products Company [2]
1970
58,386
Harold M. and
1970
10,967
Ann T. Bowman [3]
1971
12,891 $683
Concessions having been made, the following four issues *21 remain for our decision: (1) Whether NUPCO is limited in its deduction for depreciation of a patent acquired on January 5, 1970, to 8 percent of the sales of items sold under the patent. (2) Whether NUPCO's obligation to pay Bowman under a patent assignment qualifies as an "indebtedness" upon which accrued interest may be deducted under section 163(a). (3) If such obligation is found to qualify under that section, whether and to what extent interest was actually paid on the obligation in accordance with section 267(a)(2)(A). (4) Whether petitioners, Harold M. and Ann T. Bowman, timely filed their joint Federal income tax return for the taxable year ended December 31, 1971. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner National Utility Products Company (NUPCO) is an Ohio corporation incorporated on May 31, 1962. At all times relevant to this matter, it had its principal place of business in Cleveland, Ohio. NUPCO maintained its books and records and filed its Federal income tax returns using an accrual method of accounting and a calendar year. For calendar *22 years beginning January 1, 1971, NUPCO filed a timely election to be taxed as a "Subchapter S" corporation under section 1371. Harold M. Bowman (Bowman) and Ann T. Bowman are husband and wife who reside in Cleveland, Ohio. They filed joint Federal income tax returns for the calendar years 1970 and 1971 which were prepared and filed on the cash basis method of accounting. During all the years in issue, Bowman owned all of the issued and outstanding capital stock of NUPCO, which consisted of 100 shares of no par value common stock. At the time of its incorporation, Bowman's adjusted cost basis of NUPCO's stock was $1,250. On November 23, 1965, Letters Patent (hereinafter referred to as "the patent" or as "patent 1") were granted to Bowman by the United States Patent Office in connection with a device which permits the raising of the level of manholes when roads are being repaved. On January 5, 1970, Bowman sold this patent to NUPCO. In connection with this sale, two documents were executed on this date. One document, entitled "Assignment of Patent," was entered into by and between Harold M. Bowman as assignor and NUPCO as assignee. The pertinent provisions of this document *23 provided as follows: NOW, THEREFORE, the parties hereto agree as follows: 1. Assignor hereby sells, assigns and transfers to Assignee his entire right title and interest in and to the Manhole Cover Support Patent Number 3,218,943 bearing the date November 23, 1965, same to be held and enjoyed by the said Assignee for its own use to the full end of the term for which said letters patent are granted as fully and entirely as the same would have been held by Assignor had this assignment and sale not been made. 2. The purchase price shall be Seven Million Eight Hundred Thousand Dollars ($7,800,000.00) and shall be payable as follows: a. Assignee shall pay Assignor eight per cent (8%) of gross sales made by Assignee resulting from the utilization of the subject patent until such time as the purchase price of Seven Million Eight Hundred Thousand Dollars ($7,800,000.00) has been fully remitted to Assignor. b. There shall be no principal payments made by Assignee to Assignor during the first twelve (12) months from the date of assignment of the subject patent. c. The first principal payment shall be due by no later than December 31, 1971 and shall consist of principal payments *24 due for the year 1970 together with principal payments due for the year 1971, said payments to be computed in accordance with Pargraph 2.a. above. d. Each and every year thereafter, Assignee shall remit to Assignor a principal payment based on eight per cent (8%) of gross sales which amount shall be due by no later than December 31, 3f each respective year. e. The unpaid balance of the purchase price beginning with the date of assignment of the subject patent shall bear simple interest at the annual rate of four per cent (4%) and same shall be due and payable by no later than March 15th of each year. The other document, executed by NUPCO in favor of Bowman, was entitled "Promissory Note." It stated, in pertinent part: On demand, the undersigned, National Utility Products Company by its President and Secretary, Harold Bowman promises to pay to the order of Harold Bowman, the principal sum of Seven Million Eight Hundred Thousand Dollars ($7,800,000.00) for value received bearing simple annual interest at the rate of four per cent (4%). Principal and interest shall be paid in installments in accordance with the terms and provisions of a certain Patent Assignment entered *25 into by and between National Utility Products Company and Harold Bowman dated the 5th day of January, 1970. The undersigned shall have the right to prepay any part or all of this note at any time or times without penalty and with interest computed only to the date of prepayment. The $7,800,000 figure was determined in 1969 in this way: Bowman first estimated what NUPCO's total unit sales of products manufactured under the patent would be for 1969. Then he estimated the probable percent by which sales could be expected to increase each year over the remaining useful life of the patent, 13 years, and thereby determined the probable total unit sales for the patent's remaining life. An estimate was next made of the selling price of patented products over the 13-year period. The expected unit sales for each year were multiplied by the expected selling price to arrive at the estimated total dollar sales for each year. Bowman's estimates, which are summarized below, indicated that $105,601,828 worth of patented products would be sold over the next 13 years. Estimated
Estimated
Estimated
Estimated Calendar
% Sales
Units
Selling
Total Year
Increase
Sold
Price
Sales
1970
20%
10,400 $39 ea. $ 405,600
1971
20%
12,480
40
499,200
1972
30%
16,224
42
681,408
1973
30%
21,091
44
928,004
1974
40%
29,527
46
1,358,242
19 75
40%
41,338
48
1,984,224
1976
50%
62,007
50
3,100,350
1977
50%
93,011
50
4,650,550
1978
50%
139,517
50 6,975,850
1979
50%
209,276
50
10,463,800
1980
50%
313,914
50
15,695,700
1981
50%
470,871
50
23,543,550
1982
50%
706,307
50
35,315,350
$105,601,828
*26 It was then determined that between 7 percent and 8 percent of the total dollar sales would be a reasonable sales price for the patent. The $7,800,000 sales price resulted from this process. In arriving at these projected figures, Bowman compared the estimated unit sales for each year with the total potential municipal market in being. Using 1968 statistics prepared by the Federal Bureau of Roads he found that there were over 532,000 miles of municipal roads and streets in the United States. Estimating that between 8 percent and 10 percent of these roads would be resurfaced each year and that each mile of road surface contained an average of 50 manholes, he determined that over 2,000,000 manholes would be raised each year. This was the product's potential yearly market used. The estimated yearly sales range from about.5 percent to approximately 30 percent of this figure.In making this estimate of the potential market, Bowman did not consider all of the potential markets for the product such as public utilities, military bases, and foreign markets.
The per unit selling price of the patented product since its acquisition by NUPCO has been greater than the estimated price used *27 by Bowman in 1969 when he computed the $7,800,000 figure. Additionally dollar sales for the years before the Court have been in the projected range, and for the last year (1972) substantially exceeded projections. In addition to patent 1, Bowman applied for another patent (patent 2) in 1972 or 1973 which was granted in 1974. Application for a third patent (patent 3) was pending at the time of trial.These patents cover devices for raising the level of manhole covers for street repaving purposes, although patent 2 permits a more finite vertical height adjustment than patent 1. Bowman sold patent 2 and the application to patent 3 to NUPCO for $4,000,000 and $21,000,000, respectively. Essentially the only products NUPCO sells are castings protected by these patents. NUPCO has reported sales on its Federal income tax returns in the following amounts: Year
Sales
1969
$ 292,800
1970
394,387
1971
463,300
1972
781,347
Patent 1 was a significant technological innovation, providing a virtually unlimited opportunity for economic exploitation. The patented product enabled New York City to enter into a substantial street resurfacing program in 1970 which would *28 not otherwise have been undertaken. Aside from products produced by NUPCO under patents 2 and 3, there is no genuine competition to products produced under it. In payment of the 4 percent per annum interest on the unpaid balance due on the patent's purchase price, NUPCO issued to Bowman two cognovit notes. The first cognovit note was issued on March 8, 1971. In it NUPCO promised to pay Bowman on demand $312,000 with interest at the rate of 6 percent per annum. The second cognovit note was issued on March 6, 1972. In it NUPCO promised to pay Bowman on demand $309,255 with interest at the rate of 6 percent per annum. On their 1971 and 1972 Federal income tax returns the Bowmans reported the face amounts of these notes, $312,000 and $309,255, respectively, as income. On the day the first note was signed, the balance of NUPCO's various banking accounts totaled $28,005.25. The maximum amount NUPCO had in these accounts at any one time during March 1971 was $44,564.15, and it ended the year 1971 with $71,724.12. By the end of March 1972, the month during which the second note was signed NUPCO's banking accounts totaled $30,233.29, and this increased to $102,836.16 by December 29, 1972. *29 NUPCO's cash, accounts receivable, inventories, fixed depreciable assets (less depreciation), total assets, accounts payable, and total deficit were listed on its balance sheets for the period 1970 through 1972 as follows: 1970
1971
1972
Cash $ 32,340 $ 67,256 $ 120,545
Accounts rec.
70,976
87,136
162,843
Inventories
92,497
106,647
90,977
Fixed assets
17,513
40,298
45,391
Total assets
7,413,601
6,903,836
10,497,913
Accounts pay-
able
36,260
37,097
36,882
Operating
deficit
744,575
1,547,816
2,186,123
The year-end balances on the books and records of NUPCO with regard to the two cognovit notes for the years 1971 through 1975 were as follows: Year
1971 Note
1972 Note
1971
$ 309,845
N/A
1972
273,836
$ 309,255
1973
273,836
309,255
1974
37,588
309,255
1975
233,191
The reductions in these balances were the result of allocations by journal entry at each year's end of annual withdrawals from NUPCO by Bowman. During 1973 NUPCO purchased a turboprop airplane for approximately $500,000. In 1974, it was traded in to purchase an $800,000 jet. NUPCO, after paying the down payments, obtained *30 financing to make these purchases.Also, in 1974, in order to obtain a reliable source of supply for the patented products, the decision was made to purchase a foundry. Another corporation, the stock of which was owned by Bowman, was created to purchase the foundry for a $2,000,000 purchase price. The foundry supplies all of NUPCO's needs and also manufactures products for other companies. The money for this purchase was loaned, at least in part, on the strength of NUPCO. However, the lenders who financed these purchases required NUPCO to subordinate its obligations owed to Bowman to the foundry and aircraft mortgages. On its Federal income tax return for the taxable year 1970, NUPCO claimed deductions for depreciation of $600,000 and for interest in the amount of $312,000, both in respect of the patent acquired on January 5, 1970. On its Federal income tax return for the taxable year 1971, NUPCO again claimed a $600,000 deduction for depreciation and a $309,255 interest deduction both in respect of the patent. NUPCO determined the amount of the depreciation deduction by dividing $7,800,000 by the 13 years of the patent's validity remaining when it was purchased in 1970. The *31 Bowmans received a six-month extension to file their 1971 joint Federal income tax return. This changed the date their return was due from April 15, 1972 to September 15, 1972. Their 1971 joint Federal income tax return was stamped as received by the Internal Revenue Service on September 22, 1972. ULTIMATE FINDINGS OF FACT The patent assignment unconditionally obligated NUPCO to pay Bowman $7,800,000, giving NUPCO a cost basis of $7,800,000 in the patent for purposes of computing depreciation. The cognovit note given to Bowman by NUPCO in 1971 had a fair market value when issued of $208,000. The note given in 1972 had a fair market value when issued of $206,170.
The Bowman's joint Federal income tax return for taxable year 1972 was not timely filed. OPINION Issues 1 and 2
On January 5, 1970, Bowman sold his rights under a patent for a manhole cover casting to NUPCO, his solely-owned corporation. In connection with this sale two documents, denominated "Assignment of Patent" and "Promissory Note," were executed. The resolution of the first and second issues we face depends upon the single question of whether the patent sale obligated NUPCO to pay Bowman a fixed *32 dollar sum of $7,800,000, as petitioners contend, or whether it need pay only 8 percent of gross sales of patented products up to a maximum of $7,800,000, as respondent contends. The first issue involves the proper method to determine the depreciation allowable upon the patent. Section 167(a) authorizes as a depreciation deduction "a reasonable allowance for the exhaustion, wear and tear" (including obsolescence) "of property used in the [taxpayer's] trade or business." Patents constitute intangible property which may be depreciated under this section over their useful lives. Section 1.167(a)-3, Income Tax Regs.Where the taxpayer purchases a patent for a noncontingent, fixed dollar amount, that total purchase price constitutes the basis upon which depreciation may be taken. McCullough Tool Co. v. Commissioner,33 T.C. 743 (1960), affd. 318 F.2d 790 (9th Cir. 1963). But if the sales price of a patent is expressed by a formula (such as a fraction of sales up to a stated maximum) by which a fixed dollar amount cannot be ascertained *33 until future years, the purchaser may deduct each year only the amount of the purchase price actually paid or payable. Newton Insert Co. v. Commissioner,61 T.C. 570 (1974), affd. per curiam 545 F.2d 1259 (9th Cir. 1976); Poole v. Commissioner,46 T.C. 392 (1966); Best Lock Corp. v. Commissioner,31 T.C. 1217 (1959); Associated Patentees, Inc. v. Commissioner,4 T.C. 979 (1945); Sarkes Tarzian, Inc. v. United States,159 F. Supp. 253 (S.D. Ind. 1958). Therefore, if the terms of the patent sale obligate NUPCO to pay Bowman a fixed amount of $7,800,000, NUPCO properly deducted as depreciation both in 1970 and 1971, one-thirteenth of that fixed sum ($600,000 each year) since the patent had a remaining life of 13 years when purchased.If, however, respondent is correct in characterizing the obligation as a requirement that NUPCO pay Bowman only 8 percent of gross sales up to a maximum of $7,800,000, NUPCO's maximum allowable deduction amounts to only $31,551 in 1970 and $37,064 in 1971. The second issue involves the amount of interest arising out of the patent sale which is properly *34 deductible under section 163. Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." For a liability to be accruable, within the meaning of this section, its amount must be reasonably certain and the liability must not be conditional upon the happening of future events. United Control Corp. v. Commissioner,38 T.C. 957, 967 (1962). See Putoma Corp. v. Commissioner,66 T.C. 652 (1976), on appeal (5th Cir., Mar. 14, 1977, by respondent, and Apr. 11, 1977, by petitioner); Gilman v. Commissioner,53 F.2d 47, 50 (8th Cir. 1931) affg. 18 B.T.A. 1277 (1930). Respondent argues that the amount of the underlying liability created by the patent sale was contingent upon future sales and therefore is not an "indebtedness" on which interest may be deducted. Petitioners challenge this analysis on the ground that the sale created a fixed indebtedness of $7,800,000. Thus we must determine the terms of the patent sale under the applicable state law, that of Ohio. [4] In so doing, we *35 seek primarily to ascertain the intent of the parties to the transaction as expressed in the written documents before us. United States Fire Ins. Co. v. Phil-Mar Corp.,166 Ohio St. 85, 139 N.E. 2d 330 (1956); 11 Ohio Jurisprudence 2d, "Contracts," section 134 (1955). Since both the assignment of patent and the promissory note were executed together as part of the same transaction it is proper to construe them together to determine the terms of the patent sale agreement. [5] See Starr Co. v. Columbia Broadcasting System,68 Ohio App. 352, 36 N.E. 2d 861, 864 (Hamilton Co. 1941); 17A C.J.S., "Contracts," section 298 (1963). In reading these documents we must look to all the terms and conditions in context and not merely to separate paragraphs or sentences standing alone. Billow v. Billow,97 Ohio App. 277, 125 N.E. 2d 558 (Summit Co. 1953). Additionally, it is appropriate to consider the circumstances surrounding the transaction. See National City Bank of Cleveland v. Citizens Building Co.,74 N.E. 2d 273 (Ohio App. *36 , Cuyahoga Co. 1947). *37 After considering the written documents and the testimony in light of all the surrounding circumstances, including the economic potential of the invention involved, and the appropriate judicial standards for contract interpretation articulated previously, we conclude that the patent sale unconditionally obligated NUPCO to pay Bowman the fixed sum of $7,800,000. Several factors, no one of them in itself conclusive, lead us to this conclusion. First, the wording of the documents expresses the specific consideration given for the patent. Paragraph 2 of the patent assignment begins by stating that: "The purchase price shall be Seven Million Eight Hundred Thousand Dollars * * *." By contrast, the clauses requiring NUPCO to pay 8 percent of gross sales of patented items appear in subparagraphs 2a and 2d as terms of payment. Neither these nor the other terms of payment provisions under paragraph 2 purport to limit the total amount actually payable, but only relate to the timing of payment. Indeed subparagraph 2a again unequivocally states that payments are to continue until "the purchase price" of $7,800,000 has been paid. (Subparagraph 2e also specifically refers to the "purchase *38 price.") Similarly, the promissory note describes $7,800,000 as the principal sum while referring to the patent assignment only as to the terms of payment. Where the parties "intend that the debt shall be absolute, and fix upon the future event as a convenient time for payment merely, * * * the debt will not be contingent; and, if the future event does not happen as contemplated, the law will require payment to be made within a reasonable time." [footnote omitted] [5 Jaeger, Williston on Contracts, section 799, p. 817 (3d ed. 1961), quoting DeWolfe v. French,51 Me. 420, 421, quoted with approval in North American Graphite Corp. v. Allen,184 F.2d 387, 390 (D.C. Cir. 1950).] Second, the interest requirement supplies further indication of the contractual intention to set the sale price at a fixed dollar amount. Paragraph 2e of the patent assignment requires NUPCO to pay 4 percent simple annual interest on the unpaid balance of the purchase price and the promissory note states that NUPCO will pay the principal sum of $7,800,000 "bearing simple annual *39 interest at the rate of four per cent (4%)." NUPCO issued promissory notes at amounts equal to 4 percent of the portion of the $7,800,000 unpaid at each year's end. Thus, petitioners' contention as to a fixed dollar consideration reconciles the interest provisions in the documents with each other and with the parties' consistent course of conduct under the agreement. By contrast, respondent's interpretation of a consideration dependent upon gross sales creates an inconsistency because interest could not be determined each year on the unpaid balance of an undertermined purchase price. Additionally, the promissory note and NUPCO's conduct in determining interest on the basis of a fixed $7,800,000 purchase price is consistent with the patent assignment which states that interest is to be determined with reference to the "unpaid balance of the purchase price." As between a reasonable interpretation of a contract which creates inconsistencies, and one which reconciles all the clauses, the latter is clearly preferable. German Fire Ins. Co. v. Roost,55 Ohio St. 581, 45 N.E. 1097, 1099 (1897); *40 17A C.J.S., "Contracts," section 308, p. 162 (1963). Third, the promissory note contains a clause giving NUPCO the right to prepay any or all of the $7,800,000 "without penalty and with interest computed only to the date of prepayment." Such prepayment clauses enable obligors to decrease their interest expenses and normally presuppose a determinate liability. Thus the presence of a prepayment clause herein adds further support to the conclusion that the agreement requires NUPCO to pay $7,800,000 and 4 percent interest computed on the portion of that figure unpaid each year. Fourth, petitioners' interpretation is also more in harmony with the general rule that: [Where] the contract contains a definite and unambiguous promise to pay for labor and materials performed and furnished, or for other services, equally clear and unambiguous language, expressing the intention that the happening of a contingency over which the promisee has no control shall be a condition precedent to payment, must be found in the contract before the positive and absolute agreement to pay will be considered as *41 superseded. Nikolaus v. Howe, 122 Cal. App. 2d 422, 265 P.2d 99. [Mignot v. Parkhill,237 Ore. 450, 391 P.2d 755, 759 (1964).] Finally, the circumstances surrounding Bowman's setting of the $7,800,000 figure evidence his intent to establish a fixed dollar amount. He began by computing the total expected sales of patented products over the patent's remaining useful life. Then he chose a dollar figure based on a percentage of this amount which he and his experienced patent attorney agreed was in accord with generally accepted standards for patent sales. Finally he estimated the total annual urban market to determine the reasonableness of this figure. This procedure suggests the desire to establish a firm price rather than, as respondent contends, an intent to make the sales price contingent upon gross sales. Nor did Bowman merely conceive of $7,800,000 as the maximum possible reasonable royalty. This figure amounts to only approximately 7.4 percent of the estimated $105,601,828 of sales to be made under the patent, while installments made at the rate of 8 percent of sales will reach $7,800,000 when only $97,500,000 of sales is made.
Respondent *42 objects to our conclusion by arguing that the patent assignment makes each payment dependent upon output and contains no provision should 8 percent of gross sales not reach $7,800,000. This argument fails for three reasons. First, in focusing exclusively upon subparagraphs 2a and 2d it fails to consider the other portions of the relevant documents discussed previously. In particular, respondent ignores the clear statement of the patent sale that the "purchase price shall be" $7,800,000. Read in their entirety, the documents and surrounding conduct reveal an intention to establish this amount as an unconditional purchase price. Secondly, the 8 percent of gross sales provisions merely state a convenient payment schedule and not a condition of payment. It has long been recognized that, where the parties intend an unconditional obligation and insert a clause indicating a source from which payment is to be made merely to fix the time within which payment is due, the mere failure of that source to materialize does not relieve the obligor of liability. Rather, performance may be demanded within *43 a reasonable time after the source should have been realized. See, e.g., North American Graphite Corp. v. Allan,184 F. 2d 387 (D.C. Cir. 1950); William F. Mosser Co. v. Cherry River Boom & Lumber Co.,290 Pa. 67, 138 A. 85 (1927); 5 Jaeger, Williston on Contracts, section 799 (3d ed. 1961). We believe that on the record before us, Bowman had a right to the purchase price agreed on. Even if the patent sold was not as prosperous as anticipated, the corporation was unconditionally obligated for the purchase price, and would be required to use income from other products or unrelated endeavors arising from diversification, or other assets, to satisfy the claim. Each case must, of course, be decided on the record before the Court. With this in mind, we emphasize that respondent has not argued that the transaction here involved is a sham, lacks economic reality, or is at bottom a license or a section 351 transaction masquerading as a sale. Indeed, respondent concedes that a sale occurred, and has from the deficiency notice through reply briefs rested his case solely on the assertion that the sale which admittedly occurred was for a contingent *44 consideration. We also emphasize that in agreeing that a sale took place and focusing the dispute solely on the nature of the consideration called for by the contract, respondent has presented us only with an issue of contract interpretation in which he has not made valuation an issue. Indeed, respondent stated on reply brief: Respondent does not dispute that the idea and invention of the Adjust-to-Grade casting was generally valuable. However, respondent submits that the Court need not determine an actual fair market value of the patent inasmuch as the parties to the patent assignment themselves merely provided for a maximum value based upon sales * * *. Although respondent has not raised the issue of value nor argued that the transaction is a sham or lacks economic reality, we believe it appropriate to point out that we deal here only with the basic innovation (patent number 1), and that it clearly had very substantial value. The basic invention greatly facilitated repairing of urban streets. This is a classic case of petitioner building a better mousetrap. The decision by New York City to utilize petitioners' invention in its repairing operations demonstrates the unlimited *45 economic potential involved. As we noted earlier, petitioners' estimates did not take into account the potential market represented by military bases or public utilities. Neither were foreign markets considered, including nearby cities in Canada such as Toronto and Montreal. Finally, the process itself insured increased repairing of existing mileage by obviating the necessity of raising manholes, thereby both simplifying the process and greatly reducing costs. While the basic innovation (patent number 1) was of very great value, we need not decide its precise value since respondent has consistently eschewed valuation as an issue in this case. We do, however, again emphasize that we deal only with the basic innovation (patent number 1) and NUPCO's years 1969 and 1970, and intend no implications concerning the circumstances of the transfer of the subsequent refinements (patents numbers 2 and 3). [6]
*46 Issue 3.
On March 8, 1971 and March 6, 1972, NUPCO issued cognovit notes in the amounts of $312,000 and $309,255, respectively, to Bowman, its sole shareholder. These notes were in payment of interest arising out of a patent sale which NUPCO had accrued and deducted during 1970 and 1971, respectively. Bowman reported the face value of the notes as income for the years received. The issue presented by these facts is whether the notes constituted payment of the interest within the meaning of section 267(a)(2)(A). Section 267(a)(2) denies taxpayers a deduction for interest otherwise allowable under section 163: (A) If within the period consisting of the taxable year of the taxpayer and 2 1/2 months after the close thereof (i) such * * * interest * * * [is] not paid, and (ii) the amount thereof is not includible in the gross income of the person to whom the payment is to be made; and (B) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and (C) If, at the close *47 of the taxable year of the taxpayer or at any time within 2 1/2 months thereafter, both the taxpayer and the person to whom the payment is to be made are persons specified within any one of the paragraphs of subsection (b). Although all three conditions must coexist to result in the denial of a deduction, [7] it is clear, and petitioners do not dispute, that the requirements of section 267(a)(2)(B) and (C) are satisfied. Further, both parties appear to recognize that the interest is to be treated as paid by NUPCO, and reportable as income by Bowman, to the extent of the notes' fair market value on the day of issuance. Section 1.267(a)-1(b)(3), Income tax Regs., provides: (3) The expenses and interest specified in section 267(a)(2) and this paragraph shall be considered as paid for purposes of that section to the extent of the fair market value on the date of issue of notes or other instruments of similar effect received in payment of such expenses or interest if such notes or other instruments were issued in such payment by the *48 taxpayer within his taxable year or within 2 1/2 months after the close thereof. The fair market value on the date of issue of such notes or other instruments of similar effect is includible in the gross income of the payee for the taxable year in which he receives the notes or other instruments.
See Anthony P. Miller, Inc. v. Commissioner,164 F.2d 268 (3d Cir. 1947), cert. denied 333 U.S. 861 (1948), revg. 7 T.C. 729 (1946); Musselman Hub-Brake Co. v. Commissioner,139 F.2d 65 (6th Cir. 1943), revg. a Memorandum Opinion of this Court; Mid-State Products Co. v. Commissioner,21 T.C. 696 (1954); Akron Welding & Spring Co. v. Commissioner,10 T.C. 715 (1948) (Court reviewed). Respondent contends that the notes had no ascertainable fair market value when issued and, hence, that they represent neither income to Bowman nor payment by NUPCO within that section. Conversely, petitioners contend that the notes had a fair market value equivalent to their face value when issued. They conclude, therefore, that Bowman properly reported this amount as income when received, and that section *49 267(a)(2) does not deny the deductibility of interest. Since respondent first raised the issue in the pleadings, he must bear the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.
After considering the evidence presented, we conclude that the notes were clearly not worth their face value. However, neither were they entirely worthless. Since each note constitutes payment by NUPCO and income to Bowman "to the extent of the fair market value on the date of issue," [section 1.267(a)-1(b)(3), Income Tax Regs.] we must determine each note's value. This is essentially a question of fact. See Hegra Note Corp. v. Commissioner,387 F. 2d 515 (5th Cir. 1967), affg. a Memorandum Opinion of this Court. Upon a careful consideration of all the facts, we conclude that the 1971 note was worth $208,000 when issued and the 1972 note was worth $206,170 when issued. Three principal factors convince us that the notes' fair market value when issued was less than their face value. First, while NUPCO's prospects were extremely promising *50 it was (when the obligations due Bowman were accounted for) operating at a deficit when the notes were issued. For the years 1970 through 1972 it showed growing deficits of $744,575, $1,547,816, and $2,186,123. By contrast, the vast majority of the cases in which promissory notes have been found to constitute payment at face value (including Musselman Hub-Brake Co. v. Commissioner,supra), have stressed the obligor's financial solvency as strong evidence of the notes' value. These growing deficits were due, in large part, from the fact that NUPCO depreciated its principal asset, patent 1, on a straight line basis, and were also attributable to the debt service on the patent purchase price during the years in issue. Secondly, NUPCO had neither the ready cash to pay the notes, nor sufficient accounts receivable to liquidate in order to raise the amount needed. In fact, NUPCO experienced a cash flow problem during this period. Third, we believe NUPCO could not have obtained conventional financing to borrow funds necessary to pay these obligations. Compare Akron Welding & Spring Co. v. Commissioner,10 T.C. 715 (1948). When the notes were *51 issued NUPCO had insufficient tangible assets to fully secure a loan of this size; it was highly dependent upon successful efforts to develop the market for its product; it had a large annual debt service due to the interest on the unpaid patent purchase price; and its primary asset, patent 1, though clearly of substantial value, had a limited resale market because of its novelty. There were no other companies marketing significantly similar products and any potential purchaser would also have to develop the market as NUPCO did. Petitioners point to the loans made to purchase the planes in 1973 and 1974 and to the foundry purchased in 1974, at least in part on the strength of NUPCO's credit, as evidence of its borrowing power. While these loans indicate some borrowing power in NUPCO, they were all secured by the valuable property purchased. Further, the creditors required the subordination of NUPCO's indebtedness to Bowman to their loans. It appears doubtful from this whether conventional lenders would loan money to pay these very debts which were required to be subordinated. We also note that the loan to purchase the foundry was made to another corporate entity, and that the *52 foundry had sources of income other than from production of the patented manhole casting, since the foundry produced items for several other companies in addition to NUPCO. But although these factors establish the notes' fair market value at less than face value, they do not establish the notes as entirely worthless when issued. Several facts indicate that the notes possessed considerable value. During this period NUPCO had a substantial excess of cash and accounts receivable over accounts payable: 1970
1971
1972
cash
$32,340
$67,256
$130,545
acc. rec.
70,976
87,136
162,843
acc. pay.
36,260
37,097
36,882
Furthermore, its cash flow problems were apparently generated by its increased sales which nearly doubled during this period. Thus it did have substantial liquid reesources to satisfy at least part of its liability. While payment of the notes remained in part dependent upon the success of the business, there were substantial reasons for a potential purchaser of these notes to accept such risks. The patent represented a significant technological innovation which saved both time and money over previous methods. It had no competitors *53 when the notes were issued. Total sales, cash, and accounts receivable increased dramatically during this period, and with the decision of New York City in 1970 to engage in a substantial resurfacing program using NUPCO's patented products, NUPCO was assured of a large urban market for its product. Expanded sales also meant that the unpaid patent sales price (upon which interest accrued) would be reduced at an accelerated rate. This would decrease future interest payments and improve cash flow. The note paid 6 percent interest and was a cognovit note which gave the holder the power to obtain a judgment lien at will to protect his interest.NUPCO had few nonshareholder debts and was accumulating a growing body of fixed depreciable assets. We also note that NUPCO paid the entire amount of the 1971 note and a substantial portion of the 1972 note by the end of 1975. "Although that fact was not available in determining the fair market value of the notes when they were received, we think [subsequent payments on the notes], when properly discounted in the light of the other evidence, tends to afford some criterion concerning the fair market value of the notes in question." Wray-Dickinson Co., Inc. v. Commissioner,6 B.T.A. 269, 273 (1927). *54 Accord Whitlow v. Commissioner,82 F. 2d 569, 571 (8th Cir. 1936), affg. a Memorandum Opinion of this Court. Thus, we believe that a creditor would be willing to accept these notes at a substantial discount reflecting the risk involved. Considering the foregoing and also respondent's burden of proof, we believe that a reasonable discount would amount to forty percent of the notes' face value. Respondent's adamant insistence upon the notes' worthlessness rests principally upon the conclusion that Bowman could not have received their full face value on the day of issuance. But respondent's regulation plainly states that "interest * * * shall be considered as paid for purposes of [section 267(a)(2)] to the extent of the fair market value on the date of issue of notes * * *." Sec. 1.267(a)-1(b)(3), Income Tax Regs., supra. The value of a promissory note depends upon factors other than merely the issuer's ready cash, such as the note's interest and probability of eventual payment. Further, respondent's position ignores the substantial *55 corporate assets, both liquid and fixed, available for satisfaction of at least a portion of the obligation. Petitioners' opposite, but equally adamant position relies primarily upon the Bowmans' inclusion of the face value of the cognovit notes in their taxable income for the years in which they received them. This reliance ignores the fact that section 267 makes includability, and not inclusion by the recipient, a test of deductibility. The mere fact the recipient included the notes in income, while relevant, is not controlling.See F. D. Bissett & Son, Inc. v. Commissioner,56 T.C. 453, 462 (1971). Furthermore, since both the issuer and recipient are before us on this issue, our decision avoids any potential unfairness in denying the issuer a portion of its note as a deduction while the recipient recognizes its full face value as income. Issue 4.
The final issue is whether the Bowmans are liable for a 5 percent addition to tax under section 6651(a)(1), for failure to timely file their 1971 joint Federal income tax return. Because of an extention received, the due date of this return was September 15, 1972. It was stamped as received, however, on September 22, 1972, one *56 week after the due date. Bowman testified that he believed he mailed the return by the due date although he could not specifically recall so doing. The burden of proof on this issue is upon petitioners. Rule 142(a), Tax Court Rules of Practice and Procedure. After considering the evidence presented, we find that the petitioners have failed to satisfy that burden and therefore hold for respondent on this issue. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise noted. ↩
2. Petitioner National Utility Products Company will hereinafter be referred to as NUPCO. These cases were consolidated because petitioner Harold M. Bowman was the sole shareholder in NUPCO during the years in issue and the issues in both cases arise from the same set of facts. ↩
3. Ann T. Bowman is a party solely because she filed joint returns with her husband. Harold M. Bowman will hereinafter be referred to as Bowman.↩
4. Of the previous cases involving patent assignments, only McCullough Tool Co. v. Commissioner,33 T.C. 743 (1960), affd. 318 F.2d 790 (9th Cir. 1963), and Ferris v. Commissioner,T.C. Memo 1968-192, involved the issue of whether the assignments in question were for fixed or contingent amounts. Our conclusions in those cases were based upon circumstances and contractual terms significantly different from those present herein. Further, both parties have cited numerous cases involving the question of whether references to another document make a promissory note nonnegotiable. See Uniform Commercial Code, secs. 3-104, 3-105 and note 5 infra.↩ While somewhat analogous, these cases are distinguishable on the facts involved and language used, and they also present significantly different policy questions involving negotiable instrument law. The question before us here is strictly one of contractual interpretation. 5. In so holding, we reject petitioners' apparent contention that the promissory note by itself establishes NUPCO's fixed dollar liability. The promissory note states that payment is governed by another instrument, the patent assignment, and is therefore not negotiable under Ohio Rev. Code Ann., sec. 1303.04 (Page 1962). See Official Comment 8 to Uniform Commercial Code, sec. 3-105. But even if it were negotiable, as between NUPCO and Bowman the patent assignment would still be effective to create rights and liabilities between the parties independent of the promissory note. See Ohio Rev. Code Ann., sec. 1303.18 (Page 1962); Uniform Commercial Code, sec. 3-119↩.
6. In his reply brief respondent does complain that the valuation underlying the $7.8 million sale price failed to determine the present value of the patent's future earnings through Haskold's formula. See generally the description in Royal Mineral Assn. v. Commissioner,5 B.T.A. 1126 (1927), and Bonbright, Valuation of Property, 256 n. 25 (1937), and its application to patents in St. Louis Screw Co. v. Commissioner,2 B.T.A. 649↩ (1925). But as we noted, respondent has not on the record before us been concerned with value as an issue, but whether or not the consideration for the sale amounted to a fixed or contingent amount.
7. See F.D. Bissett & Son, Inc. v. Commissioner,56 T.C. 453, 460↩ (1971), and cases cited therein.